## STATE v. TURNAGE.

(Filed February 28, 1905.)

*Homicide—Manslaughter—Evidence—Question for Jury.*

1. Involuntary manslaughter is where death results unintentionally so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.

2. If death ensues from the unjustifiable and reckless use of a gun, it is manslaughter, whether the gun was intentionally discharged by the prisoner or not.

3. Where the evidence is conflicting, or where the facts testified to are such that reasonable minds may draw different inferences therefrom, the case should be submitted to the jury, with appropriate instructions as to the law, together with the contentions of both sides arising on the evidence.

4. If there is any view of the evidence construed most favorably to the prisoner, by which innocence may be inferred, such view should be presented to the jury, who are the constitutional judges not only of the truth of the testimony, but of the conclusions of fact resulting therefrom.

INDICTMENT against John Turnage, heard by *Judge W. B. Council* and a jury, at the September Term, 1904, of the Superior Court of GREENE County. From a verdict of guilty of manslaughter and judgment thereon, prisoner appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
No counsel for the prisoner.

BROWN, J. The prisoner was tried at September Term, 1904, of the Superior Court of Greene County, upon a bill of indictment charging him with the murder of James Hunt. He was convicted of manslaughter, and appeals to this court.

We set out only so much of the evidence as is necessary to
an understanding of the case.  The evidence on the part of
of the State tends to show that on the day of the homicide
the prisoner, then about 27 years of age, the deceased, Blaney
Turnage, 19 years of age, Dan Moore and Sam Moore, were
in the yard of Mrs. Turnage.  The boys had been working
in tobacco, and when it began raining, sought shelter in a
gin house.  After the rain was over they went to Mrs. Turn-
age's yard, near the house, for the purpose of getting some
peaches.  Dan Moore and Blaney Turnage were up in the
tree gathering peaches, eating some and dropping others
down to the boys below.  The boys up the tree were "chunk-
ing peaches down at the others, and John Turnage, the pris-
oner, threw a brick bat up the tree at Blaney Turnage who
was in the tree."  The boys then left the tree and went into
Mrs. Turnage's back yard.

There was evidence on the part of the State tending to
prove that the prisoner went around the house and Blaney
Turnage, his brother, followed him with an axe.  The pris-
oner went in the house and came out with a gun in his hands,
with the muzzle in the direction of the deceased, and his com-
panions, James Hunt and others.  Dan Moore, a State's wit-
ness, testified that he could not say "how high the gun was
up, or whether to the prisoner's shoulder or not, that he heard
the gun fire when the prisoner was 12 feet from the deceased.
James Hunt was hit, shot in the front of the stomach and
killed."

The prisoner, after testifying to the occurrences at the
peach tree, stated in substance that he and Blaney Turnage
were playing, that Blaney followed him with an axe and that
they were talking and laughing.  "I went in the house and
got the gun and took it out with me.  It was an old gun.
I went out the front door with the gun in my hand; as I
stepped out of the door and got clear off the porch it fired,
and as it fired I looked and saw the others coming around

the house.   The crowd were following me—Blaney in the
rear.   When I got the gun I did not know it was loaded—had
no knowledge of it.   After shooting, I learned that the gun
had been loaded; did not intentionally point the gun at
any one.   The deceased told me I did not intend to shoot
him or any one."   The prisoner further stated on cross-
examination that "the gun fired before I saw the boys.   I
did not notice whether the gun was cocked or not.   It had
been on the rack a long time and I did not know it was or
had been loaded.   I got the gun to frolic with Blaney.   If
I had had an idea it was loaded, I would not have taken it
from the rack.   I carried the gun in my right hand swinging
by my side.   I did not cock the gun.   My hand held the gun
in front of the hammer."

Among other things, Blaney Turnage testified for the
prisoner that "the gun was not kept loaded usually.   Ben
Danner told me he loaded the gun that morning."

We will notice only one exception of the prisoner, as in
our opinion the court below erred and a new trial must be
had.

Among other instructions, the court charged the jury that
upon all the evidence in the case, if believed beyond a reas-
onable doubt, the prisoner was guilty of manslaughter at
least.

We do not controvert any of the legal propositions con-
tended for by the State as to what acts will constitute man-
slaughter, when death ensues from the reckless use of a
deadly weapon, such as a pistol or gun.·  Pointing a gun
at another under such circumstances as would not excuse its
intentional discharge constitutes, in this and many other·
States, a statutory misdemeanor, and, an accidental killing
occasioned by it is manslaughter.   In this State it is imma-
terial whether the gun is loaded or not.   Acts 1889, ch. 527.
At common law, one who leveled a loaded gun at another
without intention of discharging it, and the gun goes off acci-

dentally and kills another, is guilty of manslaughter. *Regina v. Weston,* 14 Cox, C. C., 346. Involuntary manslaughter has been defined to be, "Where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done." 1 Wharton Cr. Law, sec. 305 (10th Ed.), *Barnes v. State,* 134 Ala., 36.

Applying these general principles of the law of homicide to the evidence in this case, we are of the opinion that the judge erred in his instruction that in any view of it, the prisoner was guilty of manslaughter. We do not mean to intimate that there was not sufficient evidence to go to the jury, but we think the guilt or innocence of the prisoner should have been submitted to the jury upon all the evidence, with full and appropriate instructions as to what constitutes manslaughter, as the State asked for no other verdict, and presenting to the jury the contentions of the State and prisoner arising upon the evidence. Nor do we mean to intimate that in order to constitute manslaughter, the gun must have been intentionally discharged by the prisoner. Any unjustifiable and reckless use of it which jeopardizes the safety of another is unlawful, and if death ensues therefrom, it is manslaughter. But where the evidence is conflicting, or where the facts testified to are such that reasonable minds may draw different inferences therefrom, it is settled law in this State that the case should be submitted to the jury, untrammeled by such an instruction as the one excepted to by the prisoner in this case.

The painstaking judge who tried the case in the court below seems to have overlooked the prisoner's evidence in some particulars. The prisoner denies that he fired the gun; states that he had it in his hand hanging down by his side, and as he was coming out of the house it went off accidentally; that at the time it went off he had his hand in front of the hammer, holding the gun; that he did not know it was

loaded and that he did not intentionally point it at any one; that the gun fired before he saw the boys, and that he and his brother Blaney. had been playing and he got the gun to continue the frolic. Blaney Turnage testified that the gun was usually kept unloaded and that Danner told him he loaded it that morning. The State's witness, Dan Moore, testified that he could not say how high the muzzle of the gun was up or whether the prisoner had it to his shoulder or not.

It is useless to discuss the evidence at any length. It is apparent to us that two different inferences may be drawn from it. *Robinson v. State,* 70 Tenn., 239. In considering it in the light of the instruction given, that construction should be put upon it which is most favorable to the prisoner, and if there is any view of it by which innocence may be inferred, such view should be presented to the jury.

We quote with approval the wise words of *Mr. Justice Connor* in granting a new trial in *State v. Geo. W. Daniels,* 134 N. C., 678, for a similar error committed by the writer of this opinion when on the Superior Court bench: "The prisoner, however guilty, is entitled to be tried by 'the ancient mode of trial by jury,' in which the court decides all questions of law and the jury all questions of fact." "The jury are the constitutional judges not only of the truth of the testimony, but of the conclusions of fact resulting therefrom." *Henderson, J.,* in *Bank v. Pugh,* quoted in the above case.

For the error pointed out there must be a
New Trial.