STATE v. BAILEY JOHNSON.

(Filed 20 May, 1914.)

Homicide — Trials — Self-defense — Evidence—Instructions—Appeal and Error.

Upon a trial for a homicide there was evidence tending to show that the deceased and the prisoner were friendly; that V., at whose home prisoner was living, had several days before the homicide, given the deceased permission to use his horse and buggy, and that during the night the deceased, unknown to the prisoner, took the horse from the pasture to get a prescription filled for a sick member of his family; that the prisoner was awakened and told some one had stolen the horse, and, arming himself with a gun, went in search of the supposed thief; that soon he heard the horse returning, but did not recognize deceased, who had shaved off his beard, and called to him to stop, but he kept on riding and called out "Quit that!" "Quit that!" etc.; that prisoner twice fired in the air to cause the rider to stop, and the third and fatal shot was fired because prisoner mistook a medicine bottle, which the deceased "flourished," for a pistol; and prisoner testified that he fired in apprehension for his own safety. *Held*, this evidence was sufficient to be submitted to the jury upon the question of whether the defendant reasonably believed, under the circumstances, he was acting in self-defense, or to save himself from death or great bodily harm; and an instruction that the jury return a verdict of manslaughter was reversible error.

CLARK, C. J., dissenting.

APPEAL by defendant from *Cline, J.,* at Fall Term, 1913, of AVERY.

The defendant was indicted for the murder of Roby Carter on 21 July, 1913, and from the judgment rendered on a verdict of manslaughter, he appealed. He was sentenced to four years in the State's Prison.

The deceased was living on a place owned by one Charles Voncanon, about 1½ or 2 miles from Voncanon's residence. The defendant is a boy of about 17 years of age, whose home is in Georgia, and who had been living with the Voncanons since about 20 April. On the night of the homicide the deceased went to the Voncanon pasture and took out a horse and rode off with it. Mr. Voncanon was away and Mrs. Voncanon was awakened by the slamming of the gate and the noise of the horse's hoofs. She got up, recognized the horse, but not the man, and awakened the defendant and told him to go out and see about it. The defendant went to the barn and pasture, discovered that the horse and bridle had been taken, and went over to the house of one Bynum Banner to see if he could learn anything about it. Banner had heard the horse going down the road about thirty minutes before, and while the defendant was there they heard a horse coming up the road. The defendant went out, and the witness for the State, Bynum Banner, gives the following account of the shooting: "When I heard the horse the second time, defendant left my room. I heard defendant say, 'Halt there! Throw up your hands!' three times; then gun fired; 22 rifle. Carter said, 'Quit that.' Defendant said, 'Halt and throw up your hands!' Defendant shot second time. Carter said, 'Quit that! Quit that!' Then gun fired third time, and Carter said, 'Oh, Lordy! You have killed me.' I went out; they were walking toward each other. Roby said, 'Why did you shoot me?' Defendant said, 'I am sorry that I shot you; but you ought to have told me who you were; you ought to have stopped when I called to you.'" Bynum Banner further testified, on being recalled, that the defendant said to him that he thought some one had ridden the horse to get liquor.

There was evidence tending to show that Voncanon had told the deceased that he might borrow a horse at any time, and when the deceased borrowed the horse on the night he was killed, he did so to get medicine from a doctor for his sick child.

The defendant testified in his own behalf, and the material part is as follows: "I have been living in this country since 20 April, with Mrs. Voncanon. Am 17 years old. Night of 21 July I had been out late to rehearse; went to bed; been there

half-hour. Aunt Nollie woke me up; told me she heard gate slam; heard trot of horse; thought it was a certain horse of hers; I got up, went to barn; took rifle with me; searched the pasture; found one of the horses missing; found one of the bridles missing. I went back and told her. She wanted me to go to Bynum Banner's and see if I could get any information. I went and woke him up. Asked him where his horse was. Told him our horse was gone and one of the bridles missing. We talked a few minutes; heard the horse coming. I walked out in the moonlight to the fence. I looked to see if I could recognize the man with the horse. Could not. I told him to halt and throw up his hands. I had no reason to shoot, but he kept riding, and I shot. Did not shoot to hit him. He said, 'Quit that!' I hollered to him to halt and throw up his hands again. He was getting a little by me. He twisted around and had a bottle; I thought it was a nickel-plated pistol. I shot again and he either fell off or jumped off. He said, 'Don't shoot again; it is Roby.' I did not shoot to hit him at first, but just thought he would stop. Before he wore mustache; that night he was clean shaven. I asked him why he did not tell me sooner who he was. He said he just pulled on and thought I was 'kidding' him. The horse belonged to Mr. and Mrs. Voncanon. He passed from the barn by the house going to the doctor's. Forks of roads where I shot him, but I could not tell if he intended to turn off at the forks or not. We were entirely friendly. I had given him a shirt the day before. Aunt Nollie told me that the horse had been taken without her permission." He further testified, on cross-examination: "I had known Roby Carter from April to 21 July. He worked there, but did not handle the horses. He worked a crop, but I plowed the ground for him. The moon was shining, giving light to a certain extent. I was 50 or 60 feet from Roby when I first saw him. Could not identify the horse when I first saw him. Could not tell its color, but judged it by its size and sound. I did not care about the man, but wanted the horse. Can't tell why I fired the first two shots; had no reason; fired it with the expectation of him stopping. Had the butt of gun on fence and fired straight up—the

horse was trotting all the time. I did not shoot to hit him until he flourished the bottle, and I thought it was a nickel-plated pistol."

Mrs. Nollie Voncanon testified in behalf of defendant: "Was at home that night with my two little girls and Bailey. My husband was at Elk Park. I was awakened by slamming of gate and heard horse's hoofs. I got up and recognized the horse, but not the man. I waked Bailey; told him to go to the barn and see if the horse was gone. He did so and took this little rifle. I sent him to Bynum Banner's. No one asked me about the horse. When I got to where Bailey and Roby were, Bailey said, 'Roby, why did you not speak?' and Roby said, 'I was to blame; I ought to have spoken.' On Friday Roby had a mustache and growth of beard on his face. This day his hair was clipped and he clean shaven, 'ghostly looking.' Horse has long, slinging trot, different from any other horse we ever owned. I told Bailey that some one had stolen Curly, as I thought, but for him to go to the barn and see."

His Honor charged the jury, in effect, that if they believed the evidence, the defendant was guilty of manslaughter, at least, and the defendant excepted.

*Attorney-General Bickett and Assistant Attorney-General Calvert for the State.*
*L. D. Lowe, T. A. Love, and J. W. Ragland for defendant.*

ALLEN, J. The charge of his Honor deprived the defendant of the benefit of his plea of self-defense, and if there is any evidence to support the plea, the charge is erroneous.

This Court said in *S. v. Gray,* 162 N. C., 612, that, "One may kill when necessary in defense of himself, his family, or his home, and he has the same right when not actually necessary, if he believes it to be so, and he has a reasonable ground for the belief," and in *S. v. Kimbrell,* 151 N. C., 709, "If there was *any* evidence to go to the jury in support of this contention, then it was for the *jury,* and not for the *court,* to pass upon the question of his *motive* in firing the shots, as well as the *reasonableness* of the grounds of his apprehension. *S. v. Nash,* 88 N. C., 618;

STATE *v.* JOHNSON.

*S. v. Harris,* 119 N. C., 861; *S. v. Hough,* 138 N. C., 663; *S. v. Blevins,* 138 N. C., 668; *S. v. Castle,* 133 N. C., 769; *S. v. Clark,* 134 N. C., 699; *S. v. Barrett,* 132 N. C., 1005."

It was also said in *S. v. Barrett,* 132 N. C., 1007: "In some of the early cases expressions may be found which would seem to indicate that a case of self-defense is not made out unless the defendant can satisfy the jury that he killed the deceased from necessity; but we think the most humane doctrine and the one which commends itself to us as being more in accordance with the enlightened principles of the law is to be found in the more recent decisions of this Court. It is better to hold, as we believe, that the defendant's conduct must be judged by the facts and circumstances as they appeared to him at the time he committed the act, and it should be ascertained by the jury, under the evidence and proper instructions of the court, whether he had a reasonable apprehension that he was about to lose his life or to receive enormous bodily harm. The reasonableness of his apprehension must always be for the jury, and not the defendant, to pass upon, but the jury must form their conclusion from the facts and circumstances as they appeared to the defendant at the time he committed the alleged criminal act. If his adversary does anything which is calculated to excite in his mind, while in the exercise of ordinary firmness, a reasonable apprehension that he is about to assail him and to take his life or to inflict great bodily harm, it would seem that the law should permit him to act in obedience to the natural impulse of self-preservation and to defend himself against what he supposes to be a threatened attack, even though it may turn out afterwards that he was mistaken; provided, always, as we have said, the jury find that his apprehension was a reasonable one and that he acted with ordinary firmness," and this was approved in *S. v. Blackwell,* 162 N. C., 683.

These authorities (and many others to the same effect could be cited) establish the following propositions:

(1) That one may kill in his defense when necessary to prevent death or great bodily harm.

(2) That he may kill, when not necessary, if he believes it to be so and has a reasonable ground for the belief.

(3) That the reasonableness of the belief must be judged by the facts and circumstances as they *appeared to the party* charged *at the time* of the killing.

(4) That the jury, and not the party charged, are to determine the reasonableness of the belief.

(5) That if there is any evidence that the party charged has killed under a reasonable belief that he is about to suffer death or great bodily harm, and to prevent it, the plea of self-defense must be submitted to the jury.

Applying these principles, we cannot say, as matter of law, there is no evidence of self-defense.

There is evidence tending to prove that the defendant was living at the home of Mrs. Voncanon; that on the night of the killing he was the only male present at the home; that he was awakened by Mrs. Voncanon late at night and told that her horse had been stolen; that he went to the pasture and found a horse and bridle missing; that he went to a neighbor's in search of the horse, carrying a rifle with him; that while there he heard the horse approaching and went to the road; that he recognized the horse; that he had known the deceased before, but did not know who he was at the time of the killing, because he had shaved off his mustache; that it was a moonlight night; that he told the deceased twice to stop, and he did not do so; that he fired the rifle twice and the deceased told him to quit; that he did not shoot at the deceased, but each time he shot, the butt of his rifle was resting on the fence, and he fired straight up; that after he shot the second time, the deceased twisted around and flourished something which the defendant thought was a pistol; that the defendant then fired the fatal shot and because he believed the deceased was going to shoot him.

If these facts are accepted by the jury, and they find that the last shot was fired under a reasonable apprehension of death or great bodily harm, the defendant would be entitled to an acquittal.

The deceased had a bottle of medicine and not a pistol, and he had not stolen the horse; but the conduct of the defendant must not be judged by the facts as they actually existed, but as they reasonably appeared to him.

If his evidence is believed, he thought he was in pursuit of a horse thief, and it was the part of prudence to take his rifle with him. When he met the supposed thief, he had the right to tell him to stop, and he was not in the wrong to shoot the rifle in the air, and not at the deceased, as notice that he was armed, and an inducement to obey the command to halt. If so, he was guilty of no wrongful act up to the firing of the last shot, and there is evidence that this shot was fired in self-defense.

There is evidence on the part of the State tending to prove that the defendant knew the deceased; that the killing was in a short distance of the place where the horse was taken; that as the deceased was going in that direction, the defendant must have known he was returning the horse, and other facts indicating that there was no necessity for the killing; but these are for the jury.

For the error pointed out, there must be a

New trial.

CLARK, C. J., dissenting: The deceased, Roby Carter, and the defendant lived on the land of Charlie Voncanon. Voncanon had given the deceased permission, in consideration of having doctored a crippled horse, to ride the other of his two horses. At 10 o'clock one night the child of the deceased being sick, he went to Voncanon's lot, got the other horse and went for some medicine. Voncanon being from home, his wife roused the defendant, who went down the road some 300 yards to the house of the witness Bynum Banner, who testified that he had heard the horse pass going off; that soon the deceased rode up on his return, when the defendant said, "Halt, there! throw up your hands!" three times, and fired. The deceased said, "Quit that"; the defendant again said "Halt, and throw up your hands!" three times, and shot a second time, and the deceased again said "Quit that"; then the defendant fired a third time. The deceased then said, "You have killed me," and added, "Why did you shoot me?" The defendant said, "I am sorry I shot you. You ought to have told me who you were. You ought to have stopped when I called to you." It was a moonlight night.

STATE *v.* JOHNSON.

Linville Aldrich testified that while lying on the bed wounded, the deceased said to the defendant, "You ought not to have shot me." Defendant said, "You ought to have stopped and held up your hands when I called to you," to which the deceased replied, "You shot me twice after I told you it was Roby."

Sam Aldrich testified that the deceased said at that time, "Bailey, you ought not to have shot me," to which the defendant said, "You ought to have stopped and held up your hands." The deceased replied, "You did not halt me until after you had shot twice. I told you it was Roby, and told you not to shoot." The defendant did not deny this statement then, nor in his evidence on the stand.

The defendant testified in his own behalf that he "heard the horse coming, walked out in the moonlight to the fence, did not recognize the man with the horse, told him to halt and throw up his hands. *I had no reason to shoot, but he kept riding, and I shot.* Did not shoot to hit him. He said 'Quit that.' I hollered to him to halt and throw up hands again. He was getting a little by me. He twisted around and had a bottle. I thought it was a nickel-plated pistol. I shot again, and he either fell off or jumped off. He said, 'Don't shoot again; it is Roby.' I was a little afraid of him, but I went to him. He said he was shot, and I helped him up. I did not shoot to hit him at first, but just thought he would stop." On cross-examination he said: "Can't tell why I fired the first two shots; *had no reason;* fired with the expectation of him stopping; had the butt of gun on fence and fired straight up." When asked by the solicitor, "Why did you fire?" the defendant replied, "Why didn't he stop?" He then added: "The horse was trotting all the time. I did not shoot to hit him until he flourished the bottle, and I thought it was a nickel-plated pistol." The deceased died next day at noon.

The deceased was in no fault. He took the horse by permission of the owner and went for some medicine for his sick child. On his return home with the horse, the defendant, according to his own account on the stand, was on the side of the road and told him to halt and hold up his hands, and fired twice because he did not, and then he says the deceased "flourishing" a bottle

he thought was a pistol, he fired and killed him. The two Ald-riches testified that the deceased said to the defendant that he told him who he was and told him not to shoot, twice, before he was shot fatally, and that the defendant did not halt him until after he had shot twice. The defendant did not deny this con-versation on the stand.

It appears from this evidence that the deceased was doing no unlawful act, and that the defendant shot him because he did not halt when told to do so by the defendant, and that he was unarmed. The defendant admitted on the stand that after each of the first two fires the deceased told him to "Quit that." If at this point, after being fired upon twice, the deceased had been armed and had fired back, the jury might well have acquitted the deceased upon the ground of self-defense. And if the de-fendant had then fired in return and killed, he would at least have been guilty of manslaughter, because he was in the wrong and brought on the affray. Certainly the condition of the defendant is no better when the deceased did not fire, was indeed unarmed, and the defendant does not allege even that the de-ceased pointed the bottle in his direction, but merely says that the defendant "flourished" it.

His Honor was right when he told the jury that "if they found beyond a reasonable doubt that the shot fired by the defendant caused the death of Roby Carter and the facts as to all matters in evidence which preceded the moment of the defendant's firing the rifle the third time were as testified to by all the witnesses, including the defendant himself, who was examined as a witness in his own behalf, then the defendant would be, in law, guilty of manslaughter at least, and it would be their duty to so find."

Life must be cheap indeed in North Carolina, and there is small risk in taking it, if a man riding along the road on a law-ful errand can be halted by another who commands him to throw up his hands, and because he does not stop and hold up his hands, that other fires twice, and then because he supposes, mis-takenly, that the man thus illegally assaulted "flourishes" a pistol, can kill him without liability. It makes no difference that the defendant thought the man was illegally in possession of the horse, nor that mistakenly he thought he was also in pos-

session of a pistol. In fact, the man was lawfully in possession of the horse, and the defendant does not allege that the deceased did anything except failing to stop, telling the defendant to "Quit that." The defendant says he fired first two times because deceased did not stop. Halting the deceased and firing both shots were an illegal assault. The defendant could not justify under self-defense, even though the deceased had then returned his fire. This has been recently fully discussed by *Hoke, J.,* in *S. v. Lucas,* 164 N. C., 471, holding that "self-defense may not be successfully maintained where the prisoner has wrongfully assaulted the deceased or provoked a fight resulting in the latter's death." The conduct of the defendant from the beginning was illegal. The most that can be said is that he did not intend to kill the deceased until the third shot. Having brought on the trouble by unlawfully halting the deceased and firing twice to make him stop, when he had no right to do so, the subsequent killing was done "in the commission of an unlawful act, and was manslaughter." 4 Blackstone, 191.

To excuse a defendant in such a case as this and give him the benefit of excusable or justifiable homicide, it must clearly appear that he himself had not been at fault. *S. v. Clark,* 134 N. C., 698; *S. v. Brittain,* 89 N. C., 481; *S. v. Dixon,* 75 N. C., 275.

The deceased was in lawful possession of the horse, and was bringing him back home. But even if he had taken the animal without permission, and the defendant had killed him unintentionally, when taking the horse out of the lot, instead of bringing him home (as the deceased was doing), it would have been manslaughter. In *S. v. Roane,* 13 N. C., 58, *Henderson, J.,* held: "A homicide may be justified when it takes place to prevent a threatened felony, but not when inflicted as a punishment for one already committed." And he further says: "To justify the homicide of a felon for the purpose of arresting him, the slayer must show not only felony actually committed, but also that he avowed his object and the felon refused to submit."

In Wharton on Homicide (3 Ed.) it is said: "Though the trespass was against property and the killing was unintentional, it is at least manslaughter where a deadly weapon was used,"

166—26

citing *S. v. Vance,* 17 Iowa, 138. Here the killing was intentional. And again, on the same page of Wharton: "If a killing was done to prevent a felony, however, or in defense of home, property, or of another, but was unnecessary or done with improper force, it was manslaughter only if the act was without malice; otherwise, it was murder." Here all three shots were unnecessary to prevent felony and no felony had been committed or attempted.

The defendant had no right to slay the deceased, nor to try to arrest him because he thought the horse had been taken off illegally. He was not an officer, and if he had been, he had no warrant. *S. v. Rogers, ante,* 388. The fact that the deceased was bringing the horse homeward showed that taking him at the utmost was only a trespass. As already said, the prisoner had no right to kill the deceased, even if found taking the horse out of the lot, unless the prisoner had notified the deceased first that he would arrest him, and the felon had refused to submit. *S. v. Roane, supra.*

It follows that halting the deceased and shooting twice when the deceased was returning home with the horse was unlawful, and if an affray had followed in which the defendant had slain him, it would have been at least manslaughter. The deceased, not the defendant, could have pleaded self-defense. For a far stronger reason under these circumstances, when the deceased did not fire back or even attempt to do so, but merely flourished a bottle, the killing could not be justified as self-defense. The deceased was doing nothing unlawful. The defendant was not an officer and had no warrant. That he thought the deceased had illegally taken the horse did not justify him to halt or arrest the deceased with a shotgun. His mistake in supposing that the bottle was a pistol (if indeed he did so suppose) cannot make the killing self-defense when even if the deceased had fired the defendant would not have been entitled to this defense.

Can human life in this State be taken without liability because one, rightfully going along the road, does not stop when halted illegally by another, gun in hand? And is that other (who is not even an officer) justifiable in slaying because he

thinks the man who does not halt may shoot in return? His Honor was surely correct when he told the jury that if they believed the uncontradicted evidence the defendant was at least guilty of manslaughter.