STATE v. WILLIAM ABRAHAM HODGIN.

(Filed 30 June, 1936.)

**1. Homicide G d—Testimony of immoral character of deceased held properly excluded in this prosecution for murder.**

Testimony of the character of the deceased is competent upon the plea of self-defense only when such testimony tends to show that deceased had the general reputation of being ferocious, violent, and dangerous, while testimony that deceased was immoral is irrelevant and incompetent, and in this prosecution for homicide, defendant's exception to the exclusion of testimony that deceased had the reputation of being homosexual cannot be sustained, it appearing that defendant was given the full benefit of his contention that he killed deceased in a fight resulting from deceased's indecent attack upon him, and it·further appearing that the question addressed to the witness was too limited in its scope in that it asked deceased's reputation in the police force and not deceased's general reputation.

**2. Homicide H c—Instruction in this prosecution for homicide held to sufficiently charge the jury upon the question of manslaughter.**

The charge of the court in this prosecution for homicide, when taken conjunctively, as a whole, *is held* not subject to exception for failure to define manslaughter, it appearing that the charge covered every aspect of the controversy, defined murder in the first degree and second degree, manslaughter, self-defense, malice, and reasonable doubt, applied the presumption of innocence, and gave the contentions of both sides fairly and recapitulated the evidence in the case.

APPEAL by defendant from *Clement, J.,* at 6 January Term, 1936. From FORSYTH. No error.

The defendant was tried under bill of indictment for homicide, N. C. Code, 1935 (Michie), sec. 4614, and convicted of "Guilty of murder in the first degree."

The testimony of Sam Clement, a witness for the State, was to the effect that the deceased, Herbert Searcy, was his wife's uncle, weighed about 200 to 230 pounds, and was a very active and strong man, about 70 years old. A single man, living alone, on the corner of Patterson Avenue and 7th Street in Winston-Salem, N. C. On 23 December, 1935, the witness went to the home of the deceased, about 7 o'clock in the evening, and later to get some eggs, as his wife always baked him a cake for Christmas. No one answered and he went home. On 24 December he went back about 12:30 o'clock and knocked on the door and no one answered, and he went home and ate his dinner. About 7:00 o'clock he went with the officers and broke in the house. Defendant came out from the back of the house and asked who they were looking for and was told that they were looking for Herbert Searcy, and defend-

ant told them that Searcy had gone to Reidsville—had gone night before last. The witness knew that the deceased had a sister in Reidsville. The officers left and the witness called defendant back and told him he wanted to go in the house. The defendant said, "All right," and they went in the back door, which was cracked open, and defendant said "Come in." Another fellow went in with them. He struck a match— it was all "ramshackled." "There were papers on the floor, drawers pulled out of bureaus, and things like that. He said Herb was cleaning up for Christmas and these people came for him and he got in a hurry and left everything in a mess. I told him to clean the house up and he said he would. I picked up the lamp in the middle room and went back in Herb's bedroom. When I went in, I looked under the bed. I saw two big suitcases. There are four rooms there. I asked whose suit- cases those were. He said they were Herb's. . . . I told him I would be back again the next morning. . . . I didn't go over there until around about one o'clock on Christmas day. I went over on Christmas day and knocked and knocked and nobody showed up. I says, 'I guess Herb is off spending Christmas.' I passed that over until Thursday, the day after Christmas. Around four o'clock Thursday evening, as near as I could guess at it. . . . I called up Reidsville, where his sister lived. Then I stood around a while. It was about night, and then I went down to police headquarters and told them Herb was missing somewhere. I got in the car with three of them and we went over to Herb's house. We went in the house and searched it over, from bottom to top. We looked under the beds and everywhere. We didn't find anything at all. I did not go back over there until Sunday evening. I went in the house and looked around. My nephew from Reidsville was with me. We looked and couldn't find anything at all. We went back home and Monday evening about five o'clock I got off the job and went up Patterson Avenue and went on to the house and unlocked the door. When I opened the door and looked over in the corner, I saw the trunk sitting over there. I reckon it had been there all the time. I hadn't noticed it. When I stopped right still was when I saw the trunk. I said, 'I am going to see what's in that trunk.' I kicked it, and it kicked heavy. I moved the trunk back and forth two or three times and said, 'I'm going to look in that trunk.' When I took hold of it, it felt heavy. I called another fellow. I told John I was going to look in the trunk. It had a rope around it and two straps fastened. I pulled it over in the floor. I told John to cut the rope off, and he did. I unbuckled the straps and raised up the lid and John pulled out this big pillow, a long bolster. It was packed in over Herb. The bolster was just as bloody as it could be. I reached in and pulled an old box he had crammed down on him, and when I did I said, 'John, there he

is.' He was there, right in that trunk, dead. He was folded over and crammed down in the trunk. He was beat up and in the head and cut across his head with a hatchet. He had two wounds on his right temple and they were crushed in. He was cut on his upper lip and it looked· to me like it was cut plumb in to the bone. . . . I am sure he is the man. I am most satisfied he is the one in the house that night. He looks like the same boy that was in there that night."

T. M. Mackie testified, in part, that he was a police officer and made an investigation and was passing deceased's home and was asked by Sam Clement to come in "that there was something wrong in a trunk. We went in and found Herbert Searcy pressed down in a trunk on his shoulders. His legs were pressed right back up over him. His right cheek was knocked plumb in, about where his nose should have been. Across his chin was cut plumb loose. There was a big place knocked in on his forehead. It was knocked in to the hollow. There was some blood behind this trunk, to the edge of the wall. We found this hatchet there that had two or three drops of blood splotches on it at that time. The hatchet you hand me is the hatchet that we found there, and you can see the blood on it. There was blood on the mattress of the bed on the right-hand side. The bed clothes were like it was made up. We turned them down and found the blood. We found the blood on the mattress and there were sheets, blankets and quilts on the bed. We found no blood except on the mattress, immediately behind the trunk, and on the hatchet. . . . There were moth balls scattered over the bed and the floor. The room was permeated with the odor of moth balls. Hodgin was in jail, but I do not know who apprehended him. . . . I talked to the prisoner on the night of the 30th in jail. I offered him no inducements to make any statement and made no threats. I apprised him of the fact that any statement he might make would be used against him. He made a statement under those conditions. The paper you hand me is the statement he made and signed."

In the statement of the defendant is the following: "I came here on 14 or 15 December. The murder was on Monday night, 23 December. When I came to Winston I went to the home of Herbert Searcy, 703 Patterson Avenue, to live with him. When I came I had some money. I give him $28. On Monday night we started arguing about 7 or 8 o'clock. I had asked him for my money and so he did not want to give it to me and said he was not going to give it to me, for me to stay there, and my intention was to leave because I could get no work to do, and so he got up two or three times to fight me with his fist and we had a tussel two or three times, but people kept coming in and going out and we never did finish the argument. No one saw us fighting. People coming in for drinks, and going out, only stayed a few minutes, and

when they came we would stop fussing, and would not open the door until it quieted down. When I got ready to go to bed, he got after me to make me go to bed, and after I went to bed a couple came in and went to bed in the back room. We started arguing again in the front room, and I hit him with a hatchet about his temple. I hit him three or four times with the hatchet, every time about the head, and when he fell on the bed, I hit him another time, and when I threw him on the bed I thought the people in the other room heard the noise, and I covered him up and he was making a noise trying to holler. The first lick I hit him I addled him. He told me to quit and not hit him any more. I had done hit him two or three times then, and I hit him again about the chin after I knocked him down on the bed and he was getting up when I hit him on the chin. After that he didn't say nothing I could understand. So I covered him up and went in the middle room and sat down where the stove was. The room Herb and I were in was the front room, and the stove was in the middle room and the couple in the back room. The man left about 3 or 4 o'clock and the girl left about 6:30. There was a door in the middle room and they went out that way and didn't go through the front room. After they left I went and covered him up and put him in the trunk. I went in and looked at him three times when he was on the bed. He died after the man left and before the woman left. After the woman left I put him in the trunk. Then I got the rope that was around my trunk and tied it around the trunk he was in. The couple didn't know anything about it. Then it was Tuesday morning. I had pawned the old man's overcoat and suit on Monday morning and it was Monday night I killed him. I told him I had pawned his clothes because he wouldn't give me my money, and he didn't like it, and all that was in the fuss. . . . It was not my intention to do anything like this. He had hit me with something about three hours before, the thing he puts flowers in. At the time I hit him with the hatchet there was a poker by the stove, but he didn't have anything in his hand."

The defendant testified, in part: "I roomed up at 704 Patterson Avenue, where Searcy lived, the home of the deceased, and was living there the week of 22 December. On the night of 23 December I was staying there in that house, living and sleeping there. I went to bed on that night around about twelve o'clock. I was pretty sound asleep and I was awakened by Herb. He was on top of me. . . . I got up and when we got straight, we started fighting on the bed and we fought all in this front room where we were back into the middle room where the fire was. While we were fighting in the middle room, he struck me and I fell on the stove and burned my hand. I came out from behind the stove and we started fighting. I fell over on the stove sideways and

fell around the stove. My hand touched the stove and was burned across here. It has healed up now. Then when I came out and got up on my feet, we tied up. He was trying to choke me. I broke loose from him and he grabbed a poker. I backed back and as I stepped up to go in the front room, he was on top of me. This hatchet was down beside the bed. I had stumbled and fell backwards into the other room. The hatchet was located about two feet from where I stumbled. When I came up, I picked up the hatchet, which was right beside my hand side of the bed. I picked the hatchet up and came up on my feet. He was almost standing over me. I told him to get back. After he backed me back in the corner, I got excited and started hitting him all at once with this hatchet. I beat him on the head, about half of him fell on the bed. He had the poker like that (indicating) when I got out of the middle room. As to my reaction when I regained complete consciousness and realized what was going on, I was mad and all excited. That was the first time I ever had anything happen like that to me, a man trying to take advantage of me. I felt he was trying to take advantage of me. (The court) : Do you know how many times you hit him with the hatchet? Ans.: Three or four times. I was hitting him all at once. I don't know how many times I was hitting him. . . . As we fought backwards and forth, he was trying to choke me, trying to get to me to choke me. We got into the other room. I couldn't find anything to hit him with. Herbert Searcy was about six feet tall and would weigh about 190 or 195 pounds. I am five and a half feet tall and weigh around 135 or 136. He was an active man. · He was a physically man. . . . I couldn't make the statement down at headquarters I wanted to make. I didn't mention anything about him being on top of me. (The court) : Why didn't you tell them down there at the police station? Ans.: They said I could tell it at the trial. (The court) : Was a woman down there when you made the statement? Ans.: Yes. (The court) : You didn't make that statement before her? Ans.: No, sir."

H. C. Whiteheart, a witness for defendant, testified: "I knew the deceased, Herbert Searcy. I do not remember seeing Searcy in the past two years. At that time Herb was a man around six feet tall and weighed around 160 pounds, I guess. I never had occasion to arrest Searcy. Q. Did you ever hear tell of or was it the general reputation throughout the police force that Searcy was homo-sexual? (Objection sustained, defendant excepted—if permitted to testify in the hearing of the jury, the witness would have answered: Yes, sir. I have heard it. People talked it he was.) I am a member of the police force of the city of Winston-Salem and I knew the deceased for about twenty-two or twenty-three years."

STATE v. HODGIN.

The two material exceptions and assignments of error made by defendant will be considered in the opinion.

*Attorney-General Seawell and Assistant Attorney-General McMullan for the State.*

*Robert V. Brawley and John S. Graham for defendant.*

CLARKSON, J. *First.* Defendant made exception and assignment of error to the exclusion of the testimony of H. C. Whiteheart above set forth. We do not think that this exception and assignment of error can be sustained.

In *S. v. Turpin,* 77 N. C., 473 (476-7), we find: "The general rule prevailing in most of the American states is, that such evidence is not admissible, and in this State such a general rule is well established. *S. v. Barfield,* 8 Ire., 344; *Bottoms v. Kent,* 3 Jones, 154; *S. v. Floyd,* 6 Jones, 392; *S. v. Hogue,* 6 Jones, 381. But these cases which are cited as establishing a general rule excluding such evidence admit that there may be exceptions to it, depending upon the peculiar circumstances of each case. And these exceptions themselves are now so well defined and established by the current of the more recent decisions that they have assumed a *formula* and have become a general rule subordinate to the principle rule. It is this: *Evidence of the general character of the deceased as a violent and dangerous man is admissible where there is evidence tending to show that the killing may have been from a principle of self-preservation, and also where the evidence is wholly circumstantial and the character of the transaction is in doubt,* as in *Tackett's case,* 1 Hawks, 210; Horrigan & Thompson's cases of Self-Defense, 695, and Index, under the head of 'Character of the deceased for violence,' for reference to the cases at large." (Italics ours.) *S. v. Baldwin,* 155 N. C., 494, 71 S. E., 212; *S. v. Dickey,* 206 N. C., 417 (420).

The rule is thus stated in 30 C. J., 174: "The inquiry as to the character of deceased must relate solely to his general character for violence, ferocity, vindictiveness, or bloodthirstiness. Thus, it is not admissible to prove decedent's general bad conduct or immorality."

And in Chamberlayne, Modern Law of Evidence, latter part of sec. 3295, it is said: "That the deceased in a case of homicide was a violent, turbulent man, may, on the other hand, be shown by the accused under a plea of self-defense, but not the fact that he was engaged in selling whiskey, was unchaste, or that he was a drinking man where there was no evidence that he had been drinking on the occasion in question."

Furthermore, the question propounded was too limited in its scope. It was not in respect of general reputation in the community, but "throughout the police force."

On the aspect of indecent conduct, the court below gave defendant the full benefit of his defense: "He contends from this evidence that you should not be satisfied beyond a reasonable doubt of his guilt of murder in the first degree and you should acquit him. He contends he was living there; that Searcy attacked him there in the room; that Searcy was sex-perverted; that he found him on top of him; that when he tried to get him off, he fought; that you should find Searcy was a much larger and stronger man than he was, and that Searcy fought around over the room, and Searcy finally got the poker and Searcy knocked him down on the stove; that he got up and Searcy pursued him with the poker and he backed him into the other room; that he stumbled and that he fell near the hatchet; that he got the hatchet and got up and that he struck Searcy with the hatchet while Searcy was coming on him with a poker, and that in doing so he was fighting in self-defense; that he hit Searcy in the head but he didn't know how many times he hit him; that he didn't hit him after he fell and after he killed him he put him in the trunk. He contends, gentlemen, he was justified in what he was doing; that he is not guilty of an unlawful killing at all, but you should find he is not guilty of anything, but that it is excusable homicide."

The court further charged: "The law provides that we do not weigh in golden scales equally balanced just how much force a person may use in fighting under those circumstances, because it is an abnormal condition and he is not his normal self; he is confronted with an emergency and he would not act with the same deliberation and cool judgment that he would if he were not so situated. So the law provides that you take into consideration the situation and the circumstances confronting the defendant in deciding whether it was necessary to use the force he did use or whether it reasonably appeared to him to be necessary."

N. C. Code, 1935 (Michie), sec. 564, is as follows: "No judge, in giving a charge to the petit jury, either in a civil or criminal action, shall give an opinion whether a fact is fully or sufficiently proven, that being the true office and province of the jury; but he shall state in a plain and correct manner the evidence given in the case and declare and explain the law arising thereon."

The *second* exception and assignment of error is to the effect that the charge impinged the above section, in not defining manslaughter. We think not. The charge must be taken as a whole, not disjunctively, but conjunctively. In the charge of the court below, in regard to manslaughter (in different parts of the charge), is the following: "Section 4200 of the Consolidated Statutes reads as follows: 'A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate, and premeditated killing, or which shall be committed in the perpetration or

attempt to perpetrate any arson, rape, robbery, burglary, or other felony, shall be deemed to be murder in the first degree (and shall be punished with death). All other kinds of murder shall be deemed murder in the second degree (and shall be punished with imprisonment of not less than two nor more than thirty years in the State's Prison).' . . . Then there is another statute which provides for manslaughter and the punishment therefor. . . . There are three types of unlawful homicide: Murder in the first degree, murder in the second degree, and manslaughter. Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. . . . Then you would consider whether he is guilty of manslaughter, which is the unlawful killing of a human being without malice. If he has satisfied you from the evidence he is not guilty of the unlawful killing of the deceased, then you would not convict him of anything; you would find him not guilty. . . . If the State has satisfied you beyond a reasonable doubt that the defendant is guilty of murder in the first degree, it is your duty to convict the defendant of murder in the first degree. If the State has not done so, then consider murder in the second degree. Is the defendant guilty of murder in the second degree? The burden is not on the State on murder in the second degree, because the defendant admits that he slew the deceased with a deadly weapon. Then the law requires, in order for him not to be convicted of murder in the second degree, that he come forward with evidence and satisfy you by that evidence that he is not guilty of murder in the second degree, and if he has done so, then you would not convict him of murder in the second degree. If he has satisfied you by the evidence that he is not guilty of murder in the second degree, then consider whether he is guilty of manslaughter, which is the unlawful killing of a human being. He says he is not guilty of that. It is incumbent on him to come forward with evidence and satisfy you that the killing wasn't unlawful before you would fail to convict him of that offense. He contends he has done that."

In *S. v. Lance,* 149 N. C., 551 (556), speaking to the subject as to manslaughter, *Walker, J.,* says: "Which is the unlawful killing of one person by another, but without malice. This instruction is fully supported by the authorities."

In *S. v. Baldwin,* 152 N. C., 822 (829), *Hoke, J.,* defines manslaughter as follows: "Manslaughter is the unlawful killing of another without malice."

In Wharton Criminal Law, Vol. 1 (12 Ed.), part sec. 422, p. 637, it is said: "Manslaughter is defined to be the unlawful and felonious killing of another, without malice aforethought, either express or implied."

From a careful review of the charge we find that it covered every aspect of the controversy and gave the law applicable to the facts. The

court below defined murder in the first degree and second degree, manslaughter, and self-defense. It gave the contentions fairly on both sides and recapitulated the evidence. Malice and reasonable doubt were defined and the presumption of innocence applied and the burden of proof properly defined and applied.

The briefs and arguments of defendant's counsel were able and persuasive, but on this record not convincing. On the entire record we see no prejudicial or reversible error.

No error.