## STATE v. VIOLET RAWLEY.

(Filed 25 February, 1953.)

**1. Homicide § 11—**

Since the right of a defendant to kill in self-defense arises upon the necessity, real or apparent, to save himself from death or great bodily harm, the right of self-defense cannot arise when there is no evidence that defendant acted in apprehension of such danger, real or apparent.

**2. Homicide § 27f—**

Where defendant's evidence is to the effect that deceased's death was the result of his accidentally falling upon a knife defendant was holding in her hand while lying prone on the floor, and that she did not think she was in great enough danger to make it necessary for her to cut him, but to the contrary that she did not cut him at all, *held* the principle of self-defense does not arise, notwithstanding evidence of a fight between them, and an instruction of the court to that effect is not error.

**3. Homicide § 17—**

Where defendant does not contend she killed deceased in self-defense and the State does not rely upon circumstantial evidence, but to the contrary the evidence on both sides is direct, the exclusion of testimony as to the dangerous character of the deceased is without error.

**4. Homicide §§ 8a, 27h—**

Since involuntary manslaughter is based upon negligence or culpability of defendant, where defendant's evidence is to the effect that the death was the result of deceased's accidentally falling on a knife which defendant was holding in her hand while lying prone on the floor, and not from any act or neglect on the part of defendant, *held* the question of involuntary manslaughter does not arise and an instruction of the court to this effect is not error.

APPEAL by defendant from *Armstrong, J.,* at 22 September, 1952, Term, of SURRY.

Criminal prosecution upon bill of indictment charging that on 21 April, 1952, at and in Surry County, North Carolina, with force and arms, defendant, feloniously, willfully, and of her malice aforethought, did kill and murder Thomas Cox contrary to the form of the statute, etc.

Defendant pleaded not guilty. And at the call of the case the Solicitor for the State announced in open court that the State would place defendant on trial for murder in the second degree or manslaughter, as the evidence may warrant.

These facts appear from the record to be uncontroverted: Thomas Cox, for whose death defendant Violet Rawley stands indicted, died on the late night of 21 April, 1952, in her home, a four-room house, located about a mile from the town of Mt. Airy, North Carolina. He had a stab wound in the center of his neck between the collar bones. The front

entrance to this house was into a hallway extending about "half-way of the house." On the left of this hall there was a door leading into a sitting room. On the rear of the sitting room there was a door connecting it with the kitchen. There was in the kitchen a Kelvinator, six feet high, sitting beside a door leading to the back porch. The bedroom of defendant was in the back to the right. There was a stairway up to the second floor. And there was a cot at the head of the stairway. Thomas Cox had a room in this house.

Upon the trial in Superior Court, the State offered the testimony of witnesses tending to show: That officers called to the scene found the dead body of Thomas Cox lying right in the door between the hall and the sitting room; that blood was all over the floor; that defendant was sitting on the inside of the door, beside the body, and James Stockton, another colored person, was standing in the hall; that she was "drinking right much . . . wasn't drunk"; that she said to Officer R. D. Smith, in presence of Stockton, that she "killed him, stabbed him with a knife . . . a butcher knife"; that they were fighting "at the time she killed him"; that "they had been quarreling and fighting all day"; that "he struck her there in the kitchen and knocked her down" . . . and "that he was cut while she was down on the floor"; that he "was up over her, choking her, and she down on the floor when the cutting took place"; that the front of the Kelvinator was covered with blood, and there was blood leading into the sitting room; and that Stockton made no statement.

And the State offered testimony of the coroner that at police headquarters he asked defendant if she stabbed this boy, and she said "Yes." And on being asked why she did it, she, in a kind of stupor, said, "I don't know." That he repeated the question and she gave same answer.

And the captain of police in Mt. Airy testified that the next morning defendant made statement to him, in pertinent part, as follows: "On Sunday, April 20, 1952 . . . in the afternoon I went for a ride with Maxine Gwyn, Leonard Moore, Fred Stockton, Irene and Howard Shuff. We got back to my home about 11 P. M. I was drinking very heavily. I do not know if Thomas Cox was drinking or not. When I started in the house, Thomas opened the door for me. I stepped inside the hall. Thomas and I started arguing because he thought I was stepping out on him. We got into a fight and Thomas struck me several times during the fight. I grabbed a butcher knife that was on the table. Thomas knocked me down. He must have stabbed himself as he reached down to pull me up . . ."

On the other hand, defendant offered as a witness one Jonas Taylor, who testified, in pertinent part, that he was in defendant's house, with Thomas Cox, when she came home; that he, Cox, opened the door, and she walked in and went into her room and he followed her,—closing the

door behind him,—the witness saying "I heard them fighting in there"; that she ran through the room and up the stairs—he behind her, and got her down on the bed, beating her; that Stockton went upstairs and pulled him (Cox) off of her, and she ran down the stairs, followed by him, and "just as she grabbed the butcher knife he hit her in the kitchen on the head and knocked her in the corner, kicked her two or three times, and he reached down and he fell down on her and when he backed up he was cut"; that it looked to the witness that he hurt himself when he fell on that knife blade; that "she never did strike a lick herself with the knife as I saw"; that she had the knife in her hand, kind of against the Kelvinator and kind of against the floor; and that he fell down on her and when he got up he was cut,—"I didn't see her cut him."

And the defendant, testifying as witness in her own behalf, said in pertinent part: That Thomas Cox had been living at her house, quoting her, "We had been going together and were sweethearts. I refused to go with him that night and he seemed to be mad with me. He drank a great deal, and when he was drinking I was afraid of him . . . When I went in the hallway Thomas began to argue, so I go on back through to my bedroom and as I go through the kitchen Jonas Taylor was sitting there . . . Thomas follows me there and that is where we begin fighting . . . finally I did get out of there and I went upstairs. He followed me . . . and began fighting me and choking me up there; so I finally kicked him off of me and I come back down the steps and as I come in the kitchen he was following me and I passed by the kitchen table and I saw a knife and I just picked up the knife, as if to keep him off of me and by the time I turned around he hit me and knocked me down again. I fell on this side and he was reaching me, reaching down to pick me up and that is when the knife cut him . . . I didn't strike at him. I was on my right side with the knife in my hand."

Then, to these questions, defendant answered: "Q. Why did you say you picked up the knife? A. I picked it up in order to try to keep him off of me again, just as I was trying to keep him from hitting me again. Q. Did you use it in any way to keep him off of you? You mean you wanted to use it to keep him off you, or what? A. Just use it as it might would keep him from hitting me again, or doing anything."

Then on cross-examination, defendant testified: "My memory is clear about everything that happened. I knew what I was doing. I was not too drunk to realize what I was doing. I was drinking some . . . I had a lot of trouble with Thomas. We had fights all along. That had been going on for three years. Yes, I had threatened him and he had threatened me . . . I let him continue to live in my home and have a room there for that period of time when I was afraid of him because I loved him, that is all; . . . that night Thomas and I fought for about a half

STATE *v.* RAWLEY.

hour. It was one continuous fight, upstairs and downstairs. He had been drinking . . . Neither of us were what you would call drunk. He didn't hit me with anything more than his fist. Yes, I imagine I did hit him. He was a big man, about 33 years old, and weighed about 165 or 170. I weigh 130. We did not fight in the living room. We fought in the bedroom, in the kitchen, up the steps, and upstairs. Fred . . ., Shuff . . ., Jones Taylor . . . stood there and let Thomas fight me for about 30 minutes. I didn't ask for any help. I didn't figure I needed any help . . . I didn't stick him at all . . . I did not strike at him with a knife . . . and did not intend to cut him." Then, to these questions she answered as shown: "Q. In other words you did not consider yourself in that great danger that you felt it necessary to cut him yourself, is that right? A. I didn't intend to cut him. I only wanted to protect myself. I didn't think I was in great enough danger so it was necessary for me to cut him. It was an accident. Q. You don't claim you cut him in self-defense or anything of that kind? A. I didn't strike at him with the knife. Q. You did not cut him in self-defense? A. No, sir. Q. You claim then that it was an accident? A. Yes . . . He got down far enough so that he just fell on the knife."

Defendant offered other evidence tending to corroborate her testimony. And some evidence offered by her was, upon objection, excluded.

And the State offered testimony in rebuttal.

Verdict: Guilty of manslaughter.

Judgment: Confinement in the Central Prison at Raleigh for a term of not less than seven nor more than fifteen years.

Defendant appeals therefrom to Supreme Court and assigns error.

*Attorney-General McMullan, Assistant Attorney-General Moody, and Gerald F. White, Member of Staff, for the State.*

*Folger & Folger and Woltz & Barber for defendant, appellant.*

WINBORNE, J. Among the numerous assignments of error brought up on this appeal, the first requiring express consideration is that based upon exception to this portion of the charge: "Now, gentlemen of the jury, the court in this case will not explain to you the law of self-defense which sometime arises in homicide cases because it has no application in this case for the defendant in this case claims, and it has been the theory of this trial upon which the case has been tried, that the defendant did not stab the deceased, that is did not consider herself in any danger and that the cutting or the stabbing or the falling upon this knife was an accident; so, gentlemen of the jury, the principle of self-defense has no application in this case and will not be explained to you."

The plea of self-defense or excusable homicide rests upon necessity, real or apparent. In *S. v. Marshall,* 208 N.C. 127, 179 S.E. 427, the principle is clearly stated. "The decisions are to this effect:

"1. That one may kill in defense of himself or his family when necessary to prevent death or great bodily harm. *S. v. Bryson,* 200 N.C. 50, 156 S.E. 143; *S. v. Bost,* 192 N.C. 1, 133 S.E. 176; *S. v. Johnson,* 166 N.C. 392, 81 S.E. 941; *S. v. Gray,* 162 N.C. 608, 77 S.E. 833.

"2. That one may kill in defense of himself or his family when not actually necessary to prevent death or great bodily harm, if he believes it to be necessary and has a reasonable ground for the belief. *S. v. Barrett,* 132 N.C. 1005, 43 S.E. 832.

"3. That the reasonableness of this belief or apprehension must be judged by the facts and circumstances as they appeared to the party charged at the time of the killing. *S. v. Blackwell,* 162 N.C. 672, 78 S.E. 316.

"4. That the jury and not the party charged is to determine the reasonableness of the belief or apprehension upon which he acted." *S. v. Nash,* 88 N.C. 618. See also *S. v. Terrell,* 212 N.C. 145, 193 S.E. 161; *S. v. Mosley,* 213 N.C. 304, 195 S.E. 830.

In *S. v. Johnson, supra,* the Court added to the four propositions above set forth a fifth—"That if there is any evidence that the party charged has killed under a reasonable belief that he is about to suffer death or great bodily harm, and to prevent it, the plea of self-defense must be submitted to the jury."

In other words, there must be evidence from which the jury may find that the party assailed believed at the time that it was necessary to kill his adversary to prevent death or great bodily harm, before he may seek refuge in the principle of self-defense, and have the jury pass upon the reasonableness of such belief.

In the light of these principles, the testimony of defendant to the effect (1) that, at the time, she did not think she was in great enough danger to make it necessary for her to cut deceased; (2) that not only she did not cut him in self-defense, but did not cut him at all; and (3) that she claims he was cut accidentally, refutes the idea that she believed she was in danger of losing her life or of suffering great bodily harm.

Hence, in withholding from the consideration of the jury the principle of self-defense, error is not made to appear.

Assignments of error 3 and 4, based upon exceptions of same numbers, are to the ruling of the trial judge in excluding, upon objection by the State, evidence as to the general reputation of Thomas Cox, the deceased, for being a dangerous and vicious character while drinking. These exceptions are untenable.

In *S. v. Turpin,* 77 N.C. 473 (1877), where the prisoner offered to prove the general character of the deceased as a violent and dangerous fighting man, this Court said: "The general rule prevailing in most of the American States is that such evidence is not admissible, and in this State such a general rule is well established," citing *S. v. Barfield,* 30 N.C. 344; *Bottoms v. Kent,* 48 N.C. 154; *S. v. Floyd,* 51 N.C. 392; *S. v. Hogue,* 51 N.C. 381. However, the Court continued by saying: "But these cases which are cited as establishing a general rule excluding such evidence admit that there may be exceptions to it, depending upon the peculiar circumstances of each case. And these exceptions themselves are now so well defined and established by the current of the more recent decisions that they have assumed a *formula* and have become a general rule subordinate to the principal rule. It is this: Evidence of the general character of the deceased as a violent and dangerous man is admissible where there is evidence tending to show that the killing may have been done from a principle of self preservation, and also where the eivdence is wholly circumstantial and the character of the transaction is in doubt . . ." And such is the law in North Carolina today. The cases are too numerous to cite. See Shepard's North Carolina Citations under first syllabus to the *Turpin case.* Among these are: *S. v. Hodgin,* 210 N.C. 371, 186 S.E. 495; *S. v. LeFevers,* 221 N.C. 184, 19 S.E. 2d 488. See also Stansbury's North Carolina Evidence, Section 106.

Hence, in the light of the holding in the present case that the principle of self-defense is not applicable, and the evidence is not circumstantial, the testimony offered was properly excluded.

The 6th assignment of error based upon exception No. 6, is to a portion of the charge relating to manslaughter in which, among other things, the court gave this instruction to the jury: "It has not been the theory of this trial in any aspect that there might have been an involuntary killing, that is, by reason of any culpable negligence, so involuntary manslaughter is not involved . . ."

In *S. v. Hovis,* 233 N.C. 359, 64 S.E. 2d 564, it is stated that "Involuntary manslaughter has been defined to be 'where death results unintentionally, so far as the defendant is concerned, from an unlawful act on his part not amounting to a felony, or from a lawful act negligently done.'" 1 Wharton Cr. Law, Sec. 305; *S. v. Williams,* 231 N.C. 214, 56 S.E. 2d 574; *S. v. Stansell,* 203 N.C. 69, 164 S.E. 580; *S. v. Turnage,* 138 N.C. 566, 49 S.E. 913.

In the light of this principle applied to the evidence shown in the record, and of the theory of the trial below, error is not made to appear in the instruction here considered.

All other assignments of error have been given due consideration, and fail to show error.

Hence in the judgment from which appeal is here taken, we find No error.