STATE OF NORTH CAROLINA v. ROBERT GARY BOCK, JR.

No. 37

(Filed 27 August 1975)

1. Constitutional Law § 36; Homicide § 31— first degree murder — death penalty constitutional
        The death penalty was properly imposed upon a conviction for first degree murder.

2. Constitutional Law § 29; Jury § 7— juror opposed to capital punishment — challenge for cause — time of making
        A juror may be successfully challenged for cause when, before the trial has begun, he is irreparably committed to vote against the penalty of death.

3. Constitutional Law § 29; Jury § 7— jurors opposed to capital punishment — challenge for cause by State — time of making
        The trial court did not err in allowing the State to challenge six jurors for cause before defendant had an opportunity to cross-examine them with reference to their views on capital punishment, since G.S. 9-21(b) provides in part that " . . . The State's challenge, peremptory

or for cause, must be made before the juror is tendered to the defendant. . . . "

**4. Homicide § 20— photographs of deceased — admissibility for illustration**

The trial court in a first degree murder prosecution properly allowed into evidence five photographs of the victim's body for the purpose of illustrating the testimony of two witnesses.

**5. Homicide § 21— first degree murder — sufficiency of evidence**

Evidence was sufficient to be submitted to the jury on the issue of defendant's guilt of first degree murder where such evidence tended to show that defendant and deceased engaged in sexual relations twice, deceased put pressure on defendant for money for services rendered, defendant had no money and an argument ensued, deceased started to slap defendant, but he slapped her first and knocked her to the ground, defendant returned to his car but then saw deceased coming at him with his open knife, defendant then grabbed deceased's arm but could remember nothing thereafter until he was driving from the area alone in deceased's car with his knife in it, defendant was larger than deceased and believed he would have no difficulty defending himself against her, deceased did not harm or hurt defendant in any way, the 55 stab wounds in deceased's body constituted grossly excessive force, and force which would have been lethal had deceased not already been dead was applied when the automobile was driven over her felled body.

**6. Criminal Law § 119; Homicide § 28— instruction on self-defense — request properly denied**

The trial court in a first degree murder prosecution did not err in refusing to give the jury defendant's requested instruction on self-defense since the instruction was not a correct statement of the law and there was no evidence tending to show any necessity, real or apparent, for defendant to kill deceased.

**7. Criminal Law §§ 6, 122— intoxication of defendant — additional instructions — no error**

The trial court's additional instructions given the jury bearing upon the evidence tending to show that defendant was intoxicated at the time deceased was killed were more favorable than defendant was entitled to receive.

**8. Criminal Law §§ 52, 53— hypothetical question — insufficiency of facts — opinion based on hearsay**

The trial court did not err in excluding testimony of an expert witness who was a psychiatrist as to whether defendant had complete recall of the events surrounding the time of the crime, since the facts assumed in the hypothetical question put to the witness were obviously insufficient to enable him to form a satisfactory opinion and the basis of the witness's opinion included hearsay evidence obtained by the witness from defendant's family and friends and from defendant himself during an examination to enable the witness to testify for defendant.

**9. Criminal Law § 53— doctor's expert opinion — hearsay as basis**

Generally, an expert witness cannot base his opinion on hearsay evidence, and when the facts are not within the knowledge of the witness himself, the opinion of an expert must be upon facts supported by evidence, stated in a proper hypothetical question; however, the opinion of a physician is not ordinarily rendered inadmissible by the fact that it is based wholly or in part on statements made to him by the patient, if those statements are made in the course of professional treatment and with a view of effecting a cure, or during an examination made for the purpose of treatment and cure.

**10. Criminal Law § 5— amnesia — no defense to crime**

Amnesia itself is no defense to a criminal charge.

**11. Criminal Law § 75— statement by defendant — voluntariness**

Trial court's finding that defendant's statement to a deputy sheriff was voluntarily made after he had been fully advised of his constitutional rights and had understandingly waived them was supported by competent evidence and is conclusive on appeal.

Justice LAKE concurring in result.

Chief Justice SHARP and Justices COPELAND and EXUM dissent as to death sentence.

APPEAL by defendant under G.S. 7A-27(a) from *McConnell, J.,* 4 March 1974 Session of the Superior Court of MOORE.

Defendant was tried upon an indictment, drawn under G.S. 15-144, which charged him with the murder of Karen Wilkes Stewart on 23 November 1973. From a verdict of guilty of murder in the first degree and sentence of death, defendant appealed.

The State's evidence tends to show the following facts:

About midnight on 22 November 1973 defendant arrived at the home of Martin Bergman in Moore County. He was driving the 1971 gold Mustang automobile which belonged to his companion, Miss Karen Wilkes Stewart. Bock and Bergman had known each other for about a year. They first met at the farm of Sergeant Gary Kiley, where they had worked together. Bock had visited in the Bergman home on prior occasions, but on this particular night he was not expected. When defendant and Miss Stewart first appeared at the Bergman home, they did not get out of the car. After stopping for a few seconds defendant drove away, but later Bergman observed him pass the house two or three times driving at a high rate of speed. Subsequently, defendant and Miss Stewart returned, and he told Bergman he was going to take the girl "over to the farm to show her a farm

and animals." This time they were gone only two or three minutes. When they returned they got out and joined the Bergman family and their four house guests around a camp fire. Defendant introduced Miss Stewart to the group as "Candy." After talking with the group for a while, defendant and Miss Stewart again left. Defendant was driving and Miss Stewart was seated on the passenger side. At this time defendant was wearing a shirt.

The next time Bergman saw defendant, he was again "racing up and down" in front of the house in Miss Stewart's Mustang, but at this time she was not with him. When defendant stopped at his house for the fourth time Bergman noticed that he was wearing only his T-shirt, which appeared to have spots of blood on it. Defendant had no visible injuries about his person. The shirt he had been wearing was in the automobile. When several people eventually asked defendant as to the whereabouts of Miss Stewart, his answers were conflicting. Once he said he had taken her back to Fayetteville. Then he said he had taken her down the road and thrown her out of the car.

Bergman, noticing a difference in defendant's appearance and demeanor when he returned the last time, took the car keys from him. In the car Bergman found Miss Stewart's purse, which contained her identification card and driver's license. Her automobile registration card was in the glove compartment. A cosmetic case or overnight bag was in the back seat. Kenneth Osbourne, one of the guests, found defendant's knife (State's Exhibit 2) underneath the steering wheel. There was blood on the blade, the tip of which was broken off. Defendant had nothing to say when he was questioned about the knife, "a guardian knife, approximately 4½ inches long closed, and approximately 8½ inches long with the blade open." When the blade opens the knife locks into position; when closed, each end of the knife is brass.

Sometime during the latter part of the night, defendant told Bergman that he and Miss Stewart had had sexual relations two times; that they were going to have relations again but on the third occasion, she demanded money which he did not have to give her.

About 5:30 a.m. Bergman and Sergeant Kiley asked defendant to show them where he had pushed the girl from the car. Following defendant's directions the three men then went searching for Miss Stewart but were unable to locate her.

Before 7:00 a.m. the next morning, police officers came to the Bergman home to question defendant. At that time defendant had no odor of alcohol about him, and he had no difficulty in walking. While there, the officers observed that the rear tire of the Mustang had red spots on it and found light colored hair in the shock absorbers. The officers also noticed that defendant was wearing a knife sheath which fitted the knife removed from the car the night before.

About 6:45 a.m. on 23 November 1973, Billy Shaw and two other deer hunters found the body of a blonde, female person, later identified as that of Miss Stewart, a few miles from the Bergman residence in the sandpits area of Moore County. There were tire marks on the body. Billy Shaw remained with the body until Ed Cockman, a detective from the Moore County Sheriff's Department arrived.

Detective Cockman testified that when he arrived at the sandpits he observed a nude body with many wounds and lacerations on the side of the neck, hip, and left breast. There were also stab wounds or lacerations about the face. There was blood on the ground. While there, he observed tire prints on the left leg of the victim. About two feet from the body of Karen Stewart, he observed a blanket and a pair of slacks. One shoe was close by and the other about 25 feet from the body. There were tire prints on the front and inside portion of the left leg, and there were also tire impressions on each side of the body.

After the body had been removed, Cockman returned to the Bergman residence where he found a brassiere under the small make-up kit in the car. He also observed stains which appeared to be blood stains on both rear tires of the automobile.

Cockman testified that about 10:30 a.m. he had a conversation with defendant at the sheriff's office. At this point defendant moved for a *voir dire* to determine the admissibility of defendant's statement in evidence. In the absence of the jury Cockman testified that he told defendant he wanted to question him with reference to the death of Karen Wilkes Stewart. Before doing so, however, he read him his constitutional rights in the words of the *Miranda* warning from a printed form, introduced in evidence as State's Exhibit 18. The form was then handed to defendant to read for himself. Defendant said that he understood his rights and then signed the following "Waiver of Rights":

"I have read the statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been made against me by anyone."

Defendant did not appear frightened, and was offered no reward for his statement. Cockman detected no odor of alcohol about him and in no way forced defendant to talk. The interview lasted about 30 minutes. During that time defendant made a statement which was reduced to writing.

Judge McConnell found as a fact that defendant's statement was freely and voluntarily made after he had been duly warned of all his constitutional rights and after he had freely and voluntarily waived his rights; that defendant was normal at the time, coherent, and was not confused. He ruled that defendant's statement was admissible in evidence.

Cockman then testified before the jury that defendant made the following statement to him:

"I was drinking heavy last evening, girl pulled up to a stoplight in Fayetteville and I got in the car. Mach I, color gold and black. We rode around all over Fayetteville and Spring Lake. We stopped someplace and had relations, then went to Martin Bergman's house after midnight. I had some more drinks. I was talking to Martin Bergman. Candy was talking to another guy about dogs. We left, went down road, took left out of Martin's yard, parked someplace around there and had relations again. I started driving around telling her lies, making her think I had money. Candy was putting pressure on me for money. I assumed it was for services rendered. I put my knife on the console someplace. Large pocket knife, brass ends. After this she started giving me a hassle with knife in her hand. I don't know what happened after that except I was going to put her out of the car. Next thing I remember I was at Martin Bergman's house. No one else had been with Candy and myself."

Cockman also testified that as defendant made his statement he identified the driver's license picture of Karen Wilkes Stewart as the girl he had accompanied on the night in question. He also identified the knife found in the victim's Mustang as belonging to him.

State v. Bock

Dr. C. Harold Steffe, an expert pathologist who examined Miss Stewart's body about 11:00 a.m. on 23 November 1973, testified he found 55 stab wounds in the victim's body and that the cause of death was loss of blood into the chest caused by stab wounds into a major vessel which feeds into the left lung. He also observed two tire tracks on her body, one across her chest and another across the left leg—not quite parallel. In his opinion the body was run over after death. He found no sperm in the vaginal canal, but stated that the absence of sperm did not preclude the possibility of intercourse. A blood test revealed no evidence of alcohol.

An SBI chemist testified that the blood found on defendant's T-shirt, the knife, the left rear tire, and from the human tissue recovered from underneath the car was all of Group O, which was also the victim's blood type. Defendant's blood type was analyzed as Group A.

An SBI micro-analyst testified that hair samples recovered from the underside of the Mustang bore significant similarities to hair taken from the victim. The analyst also testified that fibers taken from a blanket found at the scene were almost identical to fibers taken from the bottom of the Mustang.

At this point the State rested and defendant moved for a nonsuit on the ground that the State had offered no evidence of a premeditated and deliberated murder. The court denied this motion, and defendant offered evidence.

As a witness in his own behalf, defendant's testimony tended to show:

On 22 November 1973 defendant was 19 years old; six feet and three or four inches tall; he weighed about 195 pounds. A native of Chicago, he was a member of the 82nd Airborne Division at Fort Bragg, N. C. From time to time he assisted Sergeant Gary Kiley, a member of his unit and a friend, on the Sergeant's farm near Fort Bragg. In pitching hay and feeding animals he used the knife (State's Exhibit 2) to cut bales of hay and tangled wire in the hay baler. On November 22nd, Thanksgiving, he was not required to perform any military duties, and he was wearing the knife in its sheath because he had expected to help Sergeant Kiley on the farm. He did not know whether the point on the blade was broken off on November 22nd. When he learned that Sergeant Kiley did not need him on the farm that day, he went with a group from his unit

to the NCO Club where he purchased two fifths of Bacardi Rum. By late afternoon he had consumed at least a fifth of liquor. Sometime that evening, under circumstances which he remembers only vaguely, he met a girl who identified herself as Candy.

The girl was on Raeford Road in a Ford Mustang, and he was walking. He does not know how he happened to get in the car. She slid over and he entered the automobile on the driver's side. He had never seen her before. They proceeded down a road and engaged in sexual intercourse on a blanket outside the automobile. He believes he was drunk at that time; that there was liquor in the back seat of the Mustang. They then drove to the Bergman residence, where he spoke to Bergman and left without getting out of the car. Subsequently they returned and left again several times.

The last time defendant and Miss Stewart returned together they got out and, for a while, sat around a camp fire with Bergman and his guests. Then, once more, they left and when defendant returned Miss Stewart was not with him. He testified that during his last absence they had gone to some dark area, which he could not find again, and there engaged in sexual relations on a blanket outside the car. Thereafter, they began to argue about money which had not theretofore been mentioned. He dressed in his pants and shirt and she dressed only in a sweater. Then they met at some point near the car and she attempted to slap him. In her hand he saw the brass ends of his closed knife, which he had placed on the console in the car. He had no fear of her and knocked her to the ground. He then went back to the car with the intention of leaving without her. However, he changed his mind and turned around to see her coming at him with his knife, which was then open. He grabbed her arm and recalls nothing which happened thereafter until he was turning the car around and leaving the area. He does not recall running over her, but it is possible that he did so. He recalls driving down the center of the road following the white line and arriving at Bergman's house.

Defendant testified "that at no time, including the time he first knocked Candy down and the time he saw her coming at him with the open knife, did he intend to kill her. But he does not specifically recollect stabbing her." Karen Stewart did not harm or hurt him in any way. Her height was about to his eye level and he does not believe he would have had any difficulty in defending himself against her. He does

recall making a statement to Detective Cockman on the following morning.

A Major, a Captain, and a First Lieutenant in defendant's 82nd Airborne Division testified that defendant's general character and reputation in the military community was "very good." Sergeant Kiley testified that his reputation was "outstanding." Mrs. Bergman said that in her opinion defendant was under the influence of alcohol when he was at her home on the night of November 22nd.

Sergeant Kiley testified that when he arrived at the Bergman residence at 5:30 a.m. on the morning of November 23rd he detected no odor of alcohol on defendant's breath, but defendant did not respond to his questions and what he said "did not make good sense." Defendant told him, in response to a direct question, that he had had intercourse with Miss Stewart. However, he did not mention her having a knife; nor did he say anything about having lost any portion of his memory. Yet his demeanor was unusual, and he seemed to be trying to recall the events of the preceding night.

Dr. Charles Smith, an "accepted" expert in psychiatry whom defendant called as a witness, testified that he examined defendant on 2 March 1974, two days before the term of court at which he was tried, for two hours in the sheriff's office. In answer to a hypothetical question based upon his examination of defendant and the assumption that defendant had inflicted the stab wounds found upon Miss Stewart's body, Dr. Smith testified that he was "unable to form an opinion" as to whether defendant "could have been not conscious of what was transpiring at the time he inflicted all or any of those wounds."

Upon a *voir dire,* in the absence of the jury, Dr. Smith testified that defendant had given him a history of excessive drinking followed by blackout spells or periods of amnesia. Based upon this history, which also included details of defendant's background, early development, and his life in more recent years, as well as statements from defendant's family and friends, he had concluded that defendant "is insecure, inadequate, and a chronically anxious person who is very prone to rebel and to make angry." It was his opinion that on 23 November 1973 defendant became pathologically intoxicated. Such intoxication is "marked by a state of hyper-excitement associated with aggressive behavior and also always associated with some loss of

recall for events transpiring during the period because consciousness is disturbed. With disturbed consciousness you have absence of recall." In Dr. Smith's opinion defendant is unable to recall what happened "in the totality of what went on." He thought he had "a fragmentary recalling but that there are portions of it he does not have a clear recall for."

In the presence of the jury, counsel propounded the following question to Dr. Smith:

"Dr. Smith, based upon your examination and observation of Robert Gary Bock, Jr., and further if the jury should find as a fact that at some time in the early morning of the 23rd of November, an altercation arose between Robert Gary Bock, Jr., and an individual identified as Candy, and that some time after that altercation Robert Gary Bock, Jr., was driving an automobile down a dirt road, do you have an opinion satisfactory to yourself as to whether or not Robert Gary Bock, Jr., could in fact be unable to recall that interval between those two incidents?"

The State's objection to the foregoing question was sustained. To this ruling defendant noted his exception No. 37. If permitted to answer Dr. Smith would have said:

"It is my opinion that during the period between the onset of this altercation and the last stated event in the hypothetical question the defendant entered into a state of pathological intoxication in which his consciousness was clouded to the extent that he probably in fact does not have complete recall for the events encompassed within this time span."

At the close of his evidence defendant again moved for judgment of nonsuit. When this motion was denied defendant tendered instructions "upon his right of self-defense," which the court declined to give.

Judge McConnell instructed the jury to return one of four verdicts: Guilty of murder in the first degree, guilty of murder in the second degree, guilty of voluntary manslaughter, or not guilty. The jury's verdict was guilty of murder in the first degree. From the sentence of death imposed upon that verdict, defendant appeals to this Court.

*Attorney General James H. Carson, Jr., and Sidney S. Eagles, Jr., Assistant Attorney General, for the State.*

*W. S. Geimer for defendant appellant.*

SHARP, Chief Justice.

[1] Defendant's first and last assignments of error (Nos. 1 and 19) are based upon the premise that capital punishment is prohibited by U. S. Const. amend. VIII and amend. XIV, § 1. This is a contention which we have previously considered, and repeatedly rejected. Further discussion would be merely repetitious. *See State v. Waddell,* 282 N.C. 431, 194 S.E. 2d 19 (1973) ; *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974) ; *State v. Avery,* 286 N.C. 459, 212 S.E. 2d 142 (1975).

Assignments of error Nos. 2 and 7 are specifically abandoned in appellant's brief.

Assignment of error No. 3 relates to the manner in which the jury was selected. During the process the State successfully challenged for cause six jurors, each of whom stated that he or she would not, under any circumstances, vote for a verdict which would require the imposition of the death sentence. Defendant contends that he was prejudiced not only by "the exclusion of death-scrupled veniremen" from the panel but by their exclusion *before* he had an opportunity to cross-examine them with reference to their views on capital punishment. Neither of these contentious can be sustained.

[2] Numerous decisions of this Court have established that a juror may be successfully challenged for cause when, before the trial has begun, he is irreparably committed to vote against the penalty of death. *State v. Vinson,* 287 N.C. 326, 215 S.E. 2d 60 (1975) ; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Harris,* 283 N.C. 46, 194 S.E. 2d 796 (1973) ; *State v. Anderson,* 281 N.C. 261, 188 S.E. 2d 336 (1972). *See Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968).

[3] G.S. 9-21 (b) provides in part: " . . . The State's challenge, peremptory or for cause, must be made before the juror is tendered to the defendant. . . . " The obvious purpose of this section is to protect defendants in criminal cases by giving them

the last opportunity to challenge a venireman. As pointed out by Justice Branch in *State v. Harris,* 283 N.C. 46, 51, 194 S.E. 2d 796, 799 (1973), "G.S. 9-21(b) provides a procedure for the orderly selection of jurors. Its effect is to give to the defendant the last opportunity to exercise his right of challenge when the State had all pertinent information concerning the fitness and competency of the juror before he was tendered to the defendant." To allow defense counsel to cross-examine a juror who has informed the court and counsel that he is irrevocably committed to vote against any verdict which would result in a death sentence would thwart the protective purposes of G.S. 9-21(b). Further it would be a purposeless waste of valuable court time— a waste which the jury selection plan approved in *State v. Perry,* 277 N.C. 174, 176 S.E. 2d 729 (1970) was designed to eliminate.

Defendant relies upon *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974) to sustain his position on assignment No. 3. This decision, however, has no application to the facts of this case. In *Britt,* the trial judge refused to allow both counsel for defendant and the solicitor for the State to inquire into the moral or religious scruples, beliefs, and attitudes of the prospective jurors concerning capital punishment. He also ruled that no mention was to be made in the jury's presence of the fact that they were trying a capital case or that the death penalty might be imposed upon their verdict. For this error we ordered a new trial. The decision in *Britt* established the right of both the solicitor and defense counsel to examine any prospective juror *tendered to him* for *voir dire* with reference to his attitude toward capital punishment. The defendant in this case was not denied that right. On the contrary, as in *State v. Perry, supra,* "the method of selection offered the defendant full opportunity to exercise all his constitutional rights. The panel selected did not contain any juror to which he had objection. He fails to allege that he had exhausted his peremptory challenges." *Id.* at 177-178, 176 S.E. 2d at 731. Assignment of error No. 3 is overruled.

[4] Assignment of error No. 4 challenges the admissibility in evidence of five photographs of Miss Stewart's body in different positions as it lay in the sandpit area clad only in a sweater pulled above her breasts. Three of the pictures showed, from different camera angles, the tire tracks on her left thigh; all showed some of the wounds which had been inflicted upon her. These photographs were relevant and material; they illustrated

the testimony of Billy Shaw, the deer hunter, who came upon the body on the morning of 23 November 1973, and Officer Cockman who arrived at the scene shortly afterwards. The jury was properly instructed that the photographs were admitted for the sole purpose of illustrating the testimony of the witnesses and not as substantive evidence. "The fact that a photograph depicts a horrible, gruesome and revolting scene, indicating a vicious, calculated act of cruelty, malice or lust, does not render the photograph incompetent in evidence, when properly authenticated as a correct portrayal of conditions observed by and related by the witness who uses the photograph to illustrate his testimony." *State v. Atkinson,* 275 N.C. 288, 311, 167 S.E. 2d 241, 255 (1969). *See State v. Porth,* 269 N.C. 329, 153 S.E. 2d 10 (1967) ; *State v. Sparks,* 285 N.C. 631, 207 S.E. 2d 712 (1974) ; 2 Strong's N. C. Index 2d, *Criminal Law* §§ 42, 43 (1967) ; 1 Stansbury's North Carolina Evidence § 34 (Brandis Rev. 1973). Assignment of error No. 4 is without merit.

[5]   Assignments of error Nos. 8 and 12 are directed to the court's "failure to sustain defendant's motion for nonsuit, particularly . . . as to the charge of murder in the first degree." In his brief defendant says that these assignments present the crucial question "whether the evidence supports a finding by the jury that the killing was done with premeditation and deliberation." In his argument under assignment No. 13 defendant concedes that "he probably killed deceased." All the evidence, albeit circumstantial, leads to that conclusion. Indeed, no other legitimate deduction arises.

As an argument that the evidence will not support a finding that the killing was done with premeditation and deliberation defendant says: "The crucial facts and circumstances immediately attendant to the death of the deceased will remain unknown. . . . The conduct of the appellant before and after the homicide is totally inconsistent with first degree murder. . . . " The evidence does not support this conclusion.

In this jurisdiction it is well established that "where one forms a purpose to take the life of another and weighs this purpose in his mind long enough to form a fixed design or determination to kill at a subsequent time, no matter how soon or how late, and pursuant thereto kills, this would be a killing with premeditation and deliberation and would be murder in the first degree." *State v. Hart,* 226 N.C. 200, 202, 37 S.E. 2d

487, 488 (1946), *State v. Buchanan,* 287 N.C. 408, 215 S.E. 2d 80 (1975).

As we said in *State v. Van Landingham,* 283 N.C. 589, 599, 197 S.E. 2d 539, 545 (1973) : "Ordinarily it is not possible to prove premeditation and deliberation by direct evidence. These facts must be established by proof of circumstances from which they may be inferred. Among the circumstances to be considered in determining whether a killing was with premeditation and deliberation are: want of provocation on the part of the deceased; the conduct of defendant before and after the killing; the use of grossly excessive force, or the dealing of lethal blows after the deceased has been felled."

Defendant's statement to Detective Cockman and his testimony at the trial negate adequate provocation for the killing. After Miss Stewart and defendant had engaged in sexual relations for the second time she began "putting pressure" on him to pay her "for services rendered." He had no money—although he had represented himself to her as a well-to-do landowner—and an argument ensued. "She went to slap him and he slapped her instead and knocked her to the ground." He returned to the car and then saw her coming at him with his open knife, which weighed two pounds. He says that he grabbed her arm and remembers nothing thereafter until he was driving from the area—alone in her car, which was also carrying his knife. Defendant, a man over six feet tall, weighing 195 pounds, testified that Miss Stewart did not harm or hurt him in any way; that her height was about to his eye level, and that he did not believe he would have had any difficulty in defending himself against her.

Obviously, by any standards, Miss Stewart's death was an unnecessary and senseless killing, and the 55 stab wounds, "some quite deep," constituted "grossly excessive force." Furthermore, force which would have been lethal had Miss Stewart not already been dead was applied when the automobile was driven over her felled body. We hold that the evidence was sufficient to take the issue of defendant's guilt of first-degree murder to the jury. *State v. Van Landingham, supra,* and cases cited therein.

[6]  In his 13th assignment of error defendant asserts that the trial judge erred in refusing to give the jury the following requested instruction: "Under certain circumstances, the killing

of another is legally excusable. Defendant has offered evidence which tends to show that he acted in self-defense. The right to kill in self-defense is based on the necessity, real or apparent, to kill to save one's self from death or great bodily harm. If, from the evidence, you believe that defendant killed the deceased and at the time he did so, he believed that he was in danger of death or great bodily harm, then the defendant had the right to use such force as he believed necessary to protect himself, even to the extent of inflicting death. If excessive force or unnecessary violence is used in self-defense, however, the killing of the adversary is manslaughter at least."

The court correctly refused to give the foregoing instruction. *First,* it is not a correct statement of the law, for it omits the requirement that before one may kill in self-defense he must have reasonable grounds to believe that it is necessary to kill to protect himself from death or great bodily harm. *State v. Jackson,* 284 N.C. 383, 200 S.E. 2d 596 (1973) ; *State v. Rawley,* 237 N.C. 233, 74 S.E. 2d 620 (1953). *Second,* as noted in the preceding discussion of the question of nonsuit, there is no evidence tending to show any necessity, *real or apparent,* for defendant to kill Miss Stewart. She never hurt him in any way; he took the knife from her by simply grabbing her arm. By his own statement he does not believe he would have had any difficulty in defending himself against her; yet 55 stab wounds were inflicted upon her nude body.

The record is devoid of any evidence which would permit the jury to find that any one of the 55 stab wounds was inflicted in self-defense. Further, the law does not permit one to use a deadly weapon to repel a threatened simple assault by one whom he has disarmed and could subdue without it. *State v. Watkins,* 283 N.C. 504, 196 S.E. 2d 750 (1973).

[7]   After the jury had retired to consider its verdict, and "had been out three minutes," the solicitor requested the judge to instruct the jury with reference to the testimony of Mrs. Bergman and defendant that he was under the influence of alcohol during the night of November 22nd. The court recalled the jury and—as defendant concedes—correctly instructed it in accordance with the principles stated in *State v. Hamby* and *State v. Chandler,* 276 N.C. 674, 678, 174 S.E. 2d 385, 387

(1970) ; *State v. Propst,* 274 N.C. 62, 71-72, 161 S.E. 2d 560, 567 (1968). Specifically, the Court instructed:

" . . . Voluntary intoxication is not a legal excuse for crime. However, if you find the defendant was intoxicated you will consider whether this condition affected his ability to formulate the specific intent which is required for conviction of first degree murder. In order for you to find the defendant guilty of first degree murder, you must find beyond a reasonable doubt that he killed the deceased with malice and in the execution of an actual specific intent to kill, formed after premeditation and deliberation. If, as a result of intoxication, the defendant did not have that specific intent to kill the deceased, formed after premeditation and deliberation, he is not guilty of first degree murder. However, you would consider the other charges."

Defendant's contention, based on his assignment No. 18, is that the timing of this instruction minimized the importance of the evidence tending to show that he was drunk on the night of November 22nd and that this evidence went to "the life or death distinction between first and second degree murder." With equal logic it could be argued that the importance of the instruction was emphasized when the judge called the jury back to receive it. We have noted that when errors occur in additional instructions requested by the jury, appellants invariably argue that the prejudicial effect is compounded because the jury heard them after the charge proper.

When the charge is considered as a whole the instructions bearing upon the evidence tending to show that defendant was intoxicated at the time Miss Stewart was killed were far more favorable than he was entitled to receive. Although defendant does not judicially admit he killed Miss Stewart, he concedes he "probably" did and asserts that, if he did, he was unconscious at the time and has no recollection whatever of having done so. *If* defendant was actually unconscious, the only explanation in the record for his unconsciousness is that it was produced by his voluntary intoxication.

Ordinarily "[u]nconsciousness is a complete, not a partial, defense to a criminal charge." 21 Am. Jur. 2d, Criminal Law § 29, p. 115 (1965). *See State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328 (1969). However, when unconsciousness results from voluntary drunkenness it cannot lead "to a complete acquittal." *Bratty v. A.-G for N. Ireland,* 3 All E.R. 523, 532-

State v. Bock

533 (1961). If a person on trial for murder in the first degree was so drunk at the time he committed the homicide charged in the indictment that he was utterly incapable of forming a deliberate and premeditated intent to kill, essential elements of murder in the first degree are absent and "it is said that 'the grade of the offense is reduced to murder in the second degree.'" *State v. Bunn,* 283 N.C. 444, 458, 196 S.E. 2d 777, 786 (1973). Notwithstanding, at defendant's request, in the body of his charge the court instructed the jury as follows:

" . . . [I]n all three of the homicides which I have just defined, that is, first degree murder, second degree murder and manslaughter, intentional killing is one of the elements. I instruct you that if you find that the defendant killed the deceased the State must also satisfy you beyond a reasonable doubt that the defendant was conscious of what transpired at that time, before you could return a verdict of guilty of any offense. If a person is in fact unconscious at the time he commits an act which would otherwise be criminal, he is not responsible therefor. The absence of consciousness not only precludes the existence of any specific mental state, but also excludes the possibility of a voluntary act without which there can be no criminal liability. The question of absence of consciousness is not to be confused with the defense of insanity. Defendant's conscious state and voluntary or intentional actions are not matters which he must disprove, but are elements of the offense which I have defined, and the burden remains upon the State to satisfy you of their existence beyond a reasonable doubt."

Thus, without reference to its cause, or making any distinction as to the effect of unconsciousness caused by drunkenness upon the degrees of homicide, the jury were told to find defendant innocent of *any* degree of homicide unless the State satisfied them beyond a reasonable doubt that defendant was conscious at the time the homicide was committed. Unconsciousness caused by drunkenness cannot lead to a complete acquittal.

The jury rejected both defendant's contention that he was unconscious at the time of Miss Stewart's death and that he was too drunk to have formed the specific intent to kill her. This rejection, however, cannot be traced to any error in the charge. Assignment No. 18 is overruled.

[8] Defendant's assignment No. 11, based on his exception No. 37, is to the court's ruling which sustained the State's objection

to the hypothetical question quoted on page 7 of the preliminary statement of facts. On the basis of his two-hour examination of defendant two days before the trial, and upon the assumptions (1) that, on the night Miss Stewart was killed, an altercation arose between her and defendant and (2) that sometime thereafter defendant was driving an automobile down a dirt road, Dr. Smith was asked whether, in his opinion, defendant "probably in fact does not have complete recall of the events encompassed within this time span."

If permitted to answer Dr. Smith would have said that, in his opinion, during the early morning hours of November 23rd, defendant was in a state of pathological intoxication and "that he probably, in fact, does not have complete recall for the events encompassed within this time span."

This testimony was properly excluded. In the first place, the facts assumed in the hypothetical question were obviously insufficient to enable Dr. Smith to form a satisfactory opinion. *Todd v. Watts*, 269 N.C. 417, 152 S.E. 2d 448 (1967) ; 1 Stansbury, N. C. Evidence § 137 (Brandis Rev., 1973). Patently, the doctor's opinion was based upon evidence which was not included in the question, as well as upon facts which were not in evidence at all. The latter was defendant's history of excessive drinking followed by blackout spells or periods of amnesia, which the doctor obtained from defendant, his family and friends. However, neither defendant himself nor anyone else testified that he had such a history. Obviously, therefore, Dr. Smith's opinion was based in major part upon hearsay evidence.

[9] "Where an expert witness testifies as to facts based upon his personal knowledge, he may testify directly as to his opinion. Generally, however, an expert witness cannot base his opinion on hearsay evidence. And when the facts are not within the knowledge of the witness himself, the opinion of an expert must be upon facts supported by evidence, stated in a proper hypothetical question. (Citations omitted)." *Cogdill v. Highway Commission* and *Westfeldt v. Highway Commission*, 279 N.C. 313, 326, 182 S.E. 2d 373, 381 (1971). The opinion of a physician, however, is not ordinarily rendered inadmissible by the fact that it is based wholly or in part on statements made to him by the patient, *if those statements are made in the course of professional treatment and with a view of effecting a cure, or during an examination made for the purpose of treatment and cure. Penland v. Coal Co.*, 246 N.C. 26, 31, 97 S.E. 2d 432, 436

(1957). *See* 1 Stansbury's North Carolina Evidence § 136 (Brandis Rev., 1973). In such a situation it is reasonable to assume that the information which the patient gives the doctor will be the truth, for self-interest requires it. Here, however, Dr. Smith did not examine defendant for the purpose of treating him as a patient, but for the purpose of testifying as a witness for defendant in this case in which he is charged with first-degree murder. The motive which ordinarily prompts a patient to tell his physician the truth is absent here. The evidence was therefore incompetent and properly excluded.

[10] At this point we note that amnesia itself is no defense to a criminal charge. That a defendant is subsequently unable to remember is in itself no proof of his mental condition at the time the crime was committed. 21 Am. Jur. 2d, *Criminal Law* § 30 (1965). Assignment of error No. 11 is overruled.

Assignment of error No. 5, directed "to the admission of certain testimony of the witness Billy Shaw," is patently without merit and requires no discussion. *See State v. Greene,* 285 N.C. 482, 492-493, 206 S.E. 2d 229, 235-236 (1974) ; *State v. Colson,* 274 N.C. 295, 308, 163 S.E. 2d 376, 385 (1968).

[11] Assignment No. 6, to the admission of "a certain statement allegedly made by defendant to Deputy Sheriff Cockman," is also feckless. Upon defendant's motion the judge conducted a *voir dire* to determine its admissibility. Only Sheriff Cockman testified. Upon his uncontradicted testimony, the judge found that defendant's statement was voluntarily made after he had been fully advised of his constitutional rights and had understandingly waived them. These findings, being supported by competent evidence, are conclusive. *State v. Fox,* 277 N.C. 1, 24, 175 S.E. 2d 561, 575 (1970).

Assignments 9 and 10 relate to two questions directed to defendant, one on direct examination; the other, on cross-examination. The court's rulings upon the objections were clearly correct and these assignments are overruled without discussion. For the same reason assignments of error numbered 14, 15, 16, and 17, which challenge the court's instructions on the elements of first-degree murder and second-degree murder are likewise overruled.

We have considered the entire record in this case, as well as each of defendant's assignments of error, with care commensurate with the sentence from which defendant appeals. In his

trial and conviction we unanimously find no error. By a majority vote the Court also sustains the sentence of death. For the reasons stated in the dissenting opinions in *State v. Williams,* 286 N.C. 422, 434-441, 212 S.E. 2d 113, 121-125 (1975), Chief Justice Sharp, Justices Copeland and Exum dissent from that portion of this opinion affirming the imposition of the death sentence and vote to remand for the imposition of a sentence of life imprisonment.

In the trial we find no error and sustain the death sentence by majority vote.

No error.

Justice LAKE concurring in result.

I concur in the result reached in the majority opinion but not in the statements therein concerning the defense of unciousness when that condition is due to voluntary drunkenness.

The burden of proving this defense, like that of insanity, is upon the defendant. *State v. Caddell,* 287 N.C. 266, 215 S.E. 2d 348 (1975), which overruled, on this point, *State v. Mercer,* 275 N.C. 108, 165 S.E. 2d 328, cited in the majority opinion upon a different point. The defendant has the burden of proving to the satisfaction of the jury that he was unconscious at the time of the alleged criminal act. When, however, this fact is so established, it is a complete defense to the criminal charge, whatever may have caused it. Voluntary drunkenness, per se, is, of course, no defense to a criminal charge. However, the mere reflex action of one who has actually lost consciousness due to the effect of alcohol voluntarily consumed (i.e., one who has "passed out," as distinguished from loss of ability to understand, to intend, to reason) is not the basis for liability for a crime requiring his voluntary act. Such crimes include the lesser degrees of homicide as well as murder in the first degree. There is no evidence whatever of such unconsciousness in the present case.