STATE OF NORTH CAROLINA v. MICHAEL ALLEN STAFFORD

No. 598A85

(Filed 12 August 1986)

**Criminal Law § 53; Rape and Allied Offenses § 4— rape trauma syndrome—victim's statements to physician—inadmissible hearsay**

The trial court erred in a prosecution for second degree rape by admitting the testimony of a physician regarding rape trauma syndrome and statements made to him by the victim and her mother regarding the rape and the victim's subsequent symptoms. The testimony did not fall under the exception to the hearsay rule for statements made for medical diagnosis and treatment because it was abundantly clear on the record that the statements were made not for diagnosis and treatment but to prepare and present the State's rape trauma syndrome theory at trial; moreover, the testimony was not admissible as corroboration because it was obviously not offered for that purpose and because it went far beyond the testimony of the victim and her mother. N.C.G.S. § 8C-1, Rule 803(4).

Justice MARTIN dissenting.

Justice MITCHELL joins in the dissent.

APPEAL of right by the state under N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 77 N.C. App. 19, 334 S.E. 2d 799 (1985) (opinion by *Webb, J.,* with *Becton, J.,* concurring in the result and *Martin (John C.), J.,* dissenting), ordering a new trial for defendant on the ground of evidentiary errors. Defendant had been convicted of second degree rape before *Lewis, J.,* and a jury during the 16 July 1984 Session of WAYNE County Criminal Superior Court, and had received the presumptive twelve-year sentence.

*Lacy H. Thornburg, Attorney General, by Alfred N. Salley, Joan H. Byers and David Roy Blackwell, Assistant Attorneys General, for the state appellant.*

*Barnes, Braswell, Haithcock & Warren, P.A. by R. Gene Braswell and S. Reed Warren for defendant appellee.*

EXUM, Justice.

The Court of Appeals held in this rape case that it was reversible error to submit certain testimony concerning what a physician described as "rape trauma syndrome." Judge Webb, writing for the majority, concluded that insofar as this evidence

State v. Stafford

consisted of statements made to the physician by the prosecuting witness, the physician could not relate them because they were made to him "in preparation for going to court" and not for diagnosis and treatment, as required by N.C.G.S. § 8C-1, Rule 803(4).[1] Judge Webb concluded further that the statements related by the physician went beyond merely corroborating the prosecuting witness's own testimony. Judge Becton concurred in the result on the ground that the phenomenon referred to as "rape trauma syndrome" had not attained sufficient scientific reliability to be admissible as evidence in a criminal case. Judge Martin dissented, concluding there was no error in the admission of any of the physician's testimony. The state appeals.

We conclude the trial court committed reversible error in admitting the physician's testimony. We neither reach nor decide the question of whether in a proper case expert testimony concerning "rape trauma syndrome" will be admitted in the trial courts of this state.

I.

The state relied essentially on the testimony of the prosecuting witness who on 9 December 1983, according to the evidence, was a 13-year-old female junior high student, 5 feet 4 inches tall, 125 pounds, and well-developed for her age. She testified that on that date she spent the evening in the home of her aunt, Sally Stafford, and Sally's husband Mike Stafford, the defendant. Sometime during the night she awoke to find her hands tied behind her back with torn pillowcases and defendant standing above her. After trying to muffle her screams by putting a washcloth over her mouth, defendant laid her across the bed, pulled down her underpants and raped her. He left the room and disposed of the torn pillowcases in the fireplace. She noticed bleeding in her vaginal area; but after washing herself, she slept until morning. She had never before engaged in sexual intercourse. She told no one about the incident until sometime in January 1984 when she told a friend from school about it. Her friend convinced her to tell her mother, who, when told, notified law enforcement authorities. Her mother, the prosecuting wit-

---

1. Hereinafter references to various evidentiary rules in N.C.G.S. § 8C-1 will be made simply by rule number.

ness's school friend, and an investigating deputy sheriff testified to prior consistent statements made by the prosecuting witness to them concerning the incident.

Defendant testified in his own behalf and also presented evidence through his wife, her sister, and two character witnesses. Defendant's evidence tended to show the following:

Defendant slept with his wife and three-year-old daughter on the night in question. Defendant neither made sexual advances toward nor raped his niece. The prosecuting witness acted normally towards defendant and his family at all times before and after this incident allegedly occurred. Despite various opportunities to leave, tell her aunt, or call her parents either before or after the alleged attack, the girl remained in the house that evening, slept through the night after the incident she described, and stayed through the next morning, not telling anyone of the incident until one month later. Defendant acted normally at all times. No one heard any noise or commotion during the night the prosecuting witness spent at the Stafford's home. The next morning, the girl helped defendant's wife Sally with household chores and asked to help bake a cake for a Stafford family gathering the former wanted to attend that afternoon. No one ever found the torn pillowcases or sheets allegedly used to tie up the prosecuting witness. Neither Sally Stafford nor her sister Cheryl Parker, who normally slept in the bed occupied on 9 December 1983 by their niece, saw any blood spots on the bedding, and everything in the room was in proper order. Ms. Parker often had been alone in the house with defendant while living with the Staffords, and defendant had never made improper advances toward her. One afternoon a week or two before this incident allegedly occurred, the prosecuting witness had asked Ms. Parker if they "could go out whoring around." Furthermore, the prosecuting witness had been experiencing difficulties with female classmates who accused her of stealing their boyfriends. These conflicts upset her and caused her parents to consider transferring her to another school.

II.

The testimony giving rise to the evidentiary questions in this case was that of Dr. Joseph Ponzi, tendered by the state as an expert pediatrician. Dr. Ponzi testified that he first saw the prosecuting witness on 12 January 1984. She came to his office "with a

complaint of possible sexual abuse." He testified to the version of the crime given him by the prosecuting witness which, with a few minor inconsistencies, essentially corroborated the witness's trial testimony.

Dr. Ponzi then testified that he was familiar with the "medical term 'rape trauma syndrome.'" Upon objection the jury was excused and a voir dire was held regarding the admissibility of this line of testimony. Defendant objected on the grounds there had been no indication by the state in the discovery stages of the case that the state would rely on rape trauma syndrome. Neither was there any indication of such a diagnosis in the physician's report furnished to defendant. Upon inquiry by the court as to whether Dr. Ponzi held himself out as "an expert in the field of trauma and related sex offenses," Dr. Ponzi replied:

> That's a difficult question. . . . I don't think there are any experts per se in that field . . . but usually pediatrics sees the whole spectrum of abuse. . . . So there aren't any specialists in rape trauma or rape itself. It's something we all see and we're diagnosing more and more often. I'm not going to make any conclusions about whether or not this child was raped. . . . The only thing I will say is define what the syndrome is and say she may fulfill some of that criteria. . . . I can state what she told to me and what the symptoms of the syndrome are. I think the defense is probably right. It's hard to, you know, you have to go into an in-depth psychological before and after to probably—absolutely say it's definitely the reason why this child is living some of these symptoms. . . . I can't make any conclusions whether or not this means she was raped. I can just say she fulfills some of the criteria for the syndrome that has been defined, and that's all I can say.
>
> . . . .
>
> [Rape trauma syndrome is] a well-recognized [by the medical profession] complex number of symptoms that has been referenced multiple times. . . . I brought some articles along to substantiate the fact that it exists. Burgess and Holstrum have described what they call a rape trauma syndrome. . . . [There is a reference] in Symposium on Pediatrics and Adolescent Gynecology and Pediatric Clinics of

North Carolina, Volume 28, May 1981. Another reference is Burgess and Holstrum, Rape Trauma Syndrome, American Journal of Psychiatry, Volume 131981, 1974. It's a recognized medical syndrome.

After this voir dire the court overruled defendant's objections, the jury was returned to the courtroom and the following testimony was given by Dr. Ponzi:

Rape trauma syndrome is "a syndrome described in medical literature affecting or concerning people who have been raped, and it's a list of symptoms or a symptom complex that seems to be attributable to these people as a result of the fact they were raped.

. . . .

It shows such things as muscular skeletal complaints, headaches, vomiting, weight loss, vaginitis, dysmenorrhea, emotional turmoil.

Regarding the prosecuting witness's visit to Dr. Ponzi on 12 January, the prosecuting attorney first asked and then withdrew a question as to whether the physician made a medical diagnosis on that occasion. Dr. Ponzi testified that he spoke with the prosecuting witness on 12 January; she told him what had happened. He did not give her any tests or any type of treatment and did nothing other than talk to her and give her a physical examination.

Dr. Ponzi testified he next saw the prosecuting witness and her mother on 13 July 1984, the Friday before trial was to begin on Monday, 16 July. Dr. Ponzi asked the witness whether there had been any "unusual symptoms that had developed since the incident, or the alleged incident." Dr. Ponzi said the prosecuting witness "told me that she had a 15-pound weight loss between December and February. She said she had been vomiting. She was crying a lot, emotionally labile, and had marked, . . . decreased school performance. She had some nightmares and dreamed occasionally about the incident, the alleged incident. Tammy was noted to be depressed by the mother." Defendant's objections to this testimony were overruled and his motion to strike the testimony denied.

On cross-examination Dr. Ponzi said that he saw the prosecuting witness for about an hour per visit on 12 January and 13 July. Dr. Ponzi also admitted that peer pressure on teenagers could cause problems similar to those he had mentioned and that one could have "emotional turmoil for lots of reasons." He said his physical examination of the prosecuting witness, including her vaginal area, on 12 January was normal.

We agree with Judge Webb's opinion in the Court of Appeals that Dr. Ponzi's testimony concerning what the prosecuting witness told him on 13 July was inadmissible hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c). The statements attributable to the prosecuting witness by Dr. Ponzi were obviously offered to prove the truth of the matter asserted. Hearsay is inadmissible under Rule 802 unless the proffered testimony falls under one of the various exceptions listed in Rule 803. The exception germane to the instant case appears in Rule 803(4):

> (4) Statements for Purpose of Medical Diagnosis or Treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.

The Advisory Committee's Note to Rule 803(4) enunciates the rationale behind this exception:

> 'Even those few jurisdictions which have shied away from generally admitting statements of present condition have allowed them if made to a physician for purposes of diagnosis and treatment in view of the patient's strong motivation to be truthful. . . . The same guarantee of trustworthiness extends to statements of past conditions and medical history, made for purposes of diagnosis or treatment.

Essentially Rule 803(4) codifies prior case law on the subject. *State v. Franks*, 300 N.C. 1, 9, 265 S.E. 2d 177, 182 (1980); *State v. Wade*, 296 N.C. 454, 251 S.E. 2d 407 (1979); *State v. Bock*, 288 N.C.

145, 217 S.E. 2d 513 (1975), *death sentence vacated,* 428 U.S. 903 (1976).

Under Rule 803(4) a prerequisite to admissibility for substantive purposes of statements made to physicians is that they be "made for purposes of medical diagnosis or treatment . . . ." It is abundantly clear on this record, as Judge Webb concluded in the Court of Appeals, that the prosecuting witness's statements to Dr. Ponzi concerning symptoms she had experienced months earlier were made not for purposes of diagnosis or treatment but for the purpose of preparing and presenting the state's "rape trauma syndrome" theory at trial which was to commence three days later. Dr. Ponzi admitted that he neither treated nor diagnosed any condition of the prosecuting witness on 13 July. There was no testimony from either the prosecuting witness or her mother that they visited Dr. Ponzi for the purpose of treatment or obtaining a diagnosis. Indeed, Dr. Ponzi never diagnosed the prosecuting witness as suffering from "rape trauma syndrome." He simply listed some of the symptoms of that syndrome and then testified concerning various symptoms the prosecuting witness told him she had experienced. He never purported to give an opinion for the jury as to whether the prosecuting witness by reason of her symptomatology suffered from "rape trauma syndrome."

We are bolstered in our conclusion by our holding in *State v. Bock,* 288 N.C. 145, 217 S.E. 2d 513. In *Bock,* as in the instant case, the expert witness had seen the putative patient briefly only days before the trial in which the expert testified in the latter's behalf. The expert, a psychiatrist in *Bock,* based his opinion as did the pediatrician in the instant case on the history given by defendant (the "patient") and his family. This Court held the testimony inadmissible because the visit was to prepare for testifying at trial, not to treat and cure defendant. The information the "patient" gave, therefore, lacked the indicia of reliability based on the self-interest inherent in obtaining appropriate medical treatment.

Judge Martin in his dissent below suggested the following test for admissibility under Rule 803(4), which the state also promoted in its brief: "[I]s the declarant motivated to tell the truth because diagnosis or treatment depends on what she says; and is it reasonable for the physician or health care provider to rely on

this information." *State v. Stafford*, 77 N.C. App. at 25, 334 S.E. 2d at 802-03 (John C. Martin, J., dissenting). Even if we were to adopt that standard, it would avail the state nothing in the instant case. As the prosecuting witness did not visit him for diagnosis or treatment and Dr. Ponzi neither diagnosed nor treated her, the motivation to tell the truth is simply not present.

Neither is the challenged testimony admissible for the purpose of corroborating the prosecuting witness's or her mother's testimony. First, this is obviously not the purpose for which it was offered. Second, the prosecuting witness's mother testified merely that she "heard her [daughter] tell [Dr. Ponzi] the whole story." The prosecuting witness's mother never specified in her testimony any of the symptoms her daughter related to Dr. Ponzi. Dr. Ponzi's testimony went far beyond that of the prosecuting witness herself, who said before the jury only that she had lost 10 to 15 pounds and had made lower grades in school after the attack. On cross-examination, however, she admitted that she had been doing poorly in school before December 1983, saying "I always do bad in school. I can't help it." In contrast, Dr. Ponzi testified the prosecuting witness had told him not only about her weight loss between December and February but also that she had been vomiting, was crying a lot, was emotionally labile, had had a marked decrease in school performance, and had nightmares about the incident.

Finally, we do not deem it necessary to reach on this record the question whether in a proper case testimony about rape trauma syndrome will be admissible in the courts of this state. Other jurisdictions are divided on the issue. *Compare State v. McQuillen*, 236 Kan. 161, 689 P. 2d 822 (1984); *State v. Middleton*, 294 Or. 427, 657 P. 2d 1215 (1983); *State v. Liddell*, 685 P. 2d 918 (Mont. 1984), holding rape trauma syndrome testimony admissible, *with State v. Saldana*, 324 N.W. 2d 227 (Minn. 1982); *People v. Bledsoe*, 36 Cal. 3d 236, 681 P. 2d 291 (1984), holding rape trauma syndrome testimony inadmissible because of a lack of scientific reliability. In the instant case Dr. Ponzi never, as we demonstrated above, diagnosed the prosecuting witness as having suffered from rape trauma syndrome. Indeed he never diagnosed the prosecuting witness as suffering from any medical malady at all. His testimony on voir dire made it clear that before the prosecuting witness, or any other person, could be diagnosed as suffering

from rape trauma syndrome, that person would have to undergo an "in-depth" psychological examination both before and after the attack. This was never done in this case. Even if we were to hold that the concept of rape trauma syndrome had enough scientific reliability to be admitted into evidence in a criminal trial, a prerequisite to admissibility would be that the prosecuting witness be diagnosed as suffering from it. Since there was no such diagnosis in the instant case, testimony on the subject was not admissible for this reason alone.

For the foregoing reasons the decision of the Court of Appeals is

Affirmed.

Justice MARTIN dissenting.

I respectfully dissent. I find that the testimony of Dr. Joseph Ponzi is competent within the meaning of Rule 803(4) of the North Carolina Rules of Evidence. The only assignment of error addressed by the Court of Appeals was whether Dr. Ponzi's testimony concerning "rape trauma syndrome" was admissible. Dr. Ponzi's testimony concerning this issue was based in part upon the testimony of Tammy Ingram and her mother concerning Tammy's symptoms. The majority holds the admission of this testimony to be prejudicial error. Tammy and her mother went to Dr. Ponzi for examination on 12 January 1984, one month and three days after the rape occurred. Under Rule 803(4), statements made for the purpose of medical diagnosis and past or present symptoms, pain or sensations, are admissible. The reason for their admissibility is based upon their reliability because of the motivation of the declarant to assist the physician in diagnosis or treatment. Not only are statements by the patient admissible, but statements made to the physician by a third person as to the patient's symptoms are also admissible when made for that purpose if the court determines that such statement is likely to be reliable. 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 803(4) [01], at 145 (1985). It is not necessary that the physician actually make a diagnosis or actually treat the patient in order for the rule to apply. The majority seems to indicate that unless the physician makes the diagnosis, then the exception to the hearsay rule is not applicable. Such a restrictive interpretation obviously

could exclude statements reasonably pertinent to diagnosis or treatment of other medical conditions.

I also see no reason to exclude statements given to a medical doctor for the purpose of diagnosis *and* in preparation for trial. If the statements were made for a medical purpose, the incidental fact that the statements would be used as evidence should not make them inadmissible. To do so would likely eliminate statements made to medical doctors in the examination of claimants by doctors appointed by the Industrial Commission for that purpose. In such situations, the sole purpose often is to determine the amount of disability that a claimant has, without any purpose of making a diagnosis or giving treatment to the claimant. Rule 803(4) of the Federal Rules of Evidence is identical to the North Carolina rule. The Advisory Committee's comment to the federal rule states:

> Conventional doctrine has excluded from the hearsay exception, as not within its guarantee of truthfulness, statements to a physician consulted only for the purpose of enabling him to testify. While these statements were not admissible as substantive evidence, the expert was allowed to state the basis of his opinion, including statements of this kind. The distinction thus called for was one most unlikely to be made by juries. *The rule accordingly rejects the limitation.* This position is consistent with the provision of Rule 703 that the facts on which expert testimony is based need not be admissible in evidence if of a kind ordinarily relied upon by experts in the field.

(Emphasis added.) Thus it appears that the challenged testimony would be admissible under the federal rule. The majority has not demonstrated to me why our rule should be construed to the contrary.

Dr. Ponzi testified that when Tammy was at his office on 12 January 1984 she was very upset and cried at two points. He further testified what Tammy told him as to the facts of the incident with her uncle. Dr. Ponzi made a physical examination of Tammy on 12 January 1984 and diagnosed her condition, including her vaginal area, as normal. Dr. Ponzi then testified that he saw her on 13 July 1984, a few days before the trial. At that time he asked her and her mother if any unusual symptoms had devel-

oped since the incident. Tammy and her mother told him that she had a fifteen-pound weight loss between December and February, and she had been vomiting, was crying a lot, and was emotionally labile. Tammy had markedly decreased school performance, had nightmares and dreams about the event, and was depressed.

The majority relies upon *State v. Bock,* 288 N.C. 145, 217 S.E. 2d 513 (1975). This case was decided *before* the effective date of the new evidence code. Moreover, later cases permit this type testimony from court-appointed physicians even though the medical examination was solely for the purpose of preparing the doctor to testify. *E.g., State v. Allison,* 307 N.C. 411, 298 S.E. 2d 365 (1983) (error to exclude psychiatrist's testimony concerning substance of his conversation with defendant which provided basis of his opinion as to defendant's sanity); *State v. Wade,* 296 N.C. 454, 251 S.E. 2d 407 (1979).

The answers to the questions propounded by Dr. Ponzi to Tammy and her mother provided him with information as to Tammy's physical, emotional, and mental condition, such information being useful to the doctor as a basis for a diagnosis and treatment of her condition. As such I find that the statements are within the scope of admissible hearsay permitted by N.C.R. Evid. 803(4). *See United States v. Iron Thunder,* 714 F. 2d 765 (8th Cir. 1983); *State v. Hebert,* 480 A. 2d 742 (Me. 1984).

Dr. Ponzi's testimony also largely corroborated the testimony of Tammy and her mother. The trial judge instructed the jury as to corroborating evidence with respect to Dr. Ponzi's testimony. Although Dr. Ponzi's testimony was not precisely the same as the testimony of Tammy and her mother, the discrepancies were not so significant as to render the use of the testimony reversible error. *State v. Higginbottom,* 312 N.C. 760, 324 S.E. 2d 834 (1985). Even if the testimony in question was incompetent for one purpose, that would not prevent its admission for another proper purpose. 1 Brandis on North Carolina Evidence § 79 (1982).

Justice MITCHELL joins in this dissenting opinion.